# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 14, 2003

## STATE OF TENNESSEE v. WILLIAM HENRY VAUGHAN, IV

**Direct Appeal from the Circuit Court for Giles County**
**No. 9443     Jim T. Hamilton, Judge**

———————————

**No. M2002-01459-CCA-R3-CD - Filed December 31, 2003**

———————————

The Defendant, William Henry Vaughan, IV, was convicted by a jury of first degree premeditated murder and aggravated arson. He was sentenced to life imprisonment for the murder and to twenty-five years for the arson, with the sentences to be served consecutively. In this direct appeal, the Defendant makes the following claims: (1) the trial court erred in denying his motion to suppress; (2) he was denied his right to a speedy trial; (3) the sequestered jury was separated; (4) the trial court erred by admitting a police officer's written report in its entirety; (5) he was deprived of his fundamental constitutional right to testify; (6) the evidence is not sufficient to support his convictions; and (7) he was deprived of the effective assistance of counsel. Because we find that the Defendant was deprived of his fundamental constitutional right to testify, and because the State has failed to demonstrate that the deprivation was harmless beyond a reasonable doubt, we vacate the Defendant's convictions and remand this matter for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Reversed, Remanded

DAVID H. WELLES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ., joined.

Hershell Koger (on appeal) and J. Russell Parkes (at trial), Pulaski, Tennessee, for the appellant, William Henry Vaughan, IV.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Mike Bottoms, District Attorney General; and Robert C. Sanders, Richard Dunavant, and Patrick Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

At about three o'clock in the morning on Wednesday, April 19, 2000, Deputy Tommy Chapman was flagged down by two men, who told him that there was a house on fire. Deputy Chapman proceeded to the house and found flames coming from the upstairs area. The front door was closed but unlocked, and Deputy Chapman entered the house to see if anyone was inside. A car in the driveway and a purse in the house caused him to believe that someone was in the home. He called out and looked for occupants, but saw no one and received no response. He was unable to reach the upper floor because of the fire.

Officer Kyle Helton also responded to the fire. He testified that he saw nothing at the scene to indicate that a burglary had occurred.

By the time fire chief James Stewart Thompson arrived, other firemen had made it into the upstairs bedroom where the fire was located. There, they found the victim's body in her bed. The victim was the Defendant's mother, Sherry Agee Vaughan. The flames made it difficult to remove the body, but the firemen eventually succeeded in taking it out through an upstairs window. Chief Thompson testified that they discovered a second, separate fire on the ground floor. It took until ten o'clock that morning to put out the fires. At that point in time, no foul play was suspected.

The victim's body was delivered to Dr. Charles Harlan for an autopsy. Dr. Harlan discovered a single bullet in the victim's brain and reported his findings to the police on Thursday, April 20, 2000. The next morning (Friday), numerous persons reported back to the scene of the fire in order to search for evidence relative to the victim having died from a gunshot wound.

Donald Collins, an engineer with the fire department, was one of the persons who returned to the scene on Friday morning. He testified that, upon searching the victim's bedroom, they found burn patterns on the floor indicative of gasoline. Also, the feather bed in which the victim was found was "soaked" in gasoline. Mr. Collins assisted in the search for a gun or shell casing in the bedroom, but found neither.

Officer Joey Turner also assisted in the investigative work at the scene on Friday. He found a piece of what looked like a flannel gown on the bed; the item was burnt. He also found two hand-written notes in the house, written by the victim and the Defendant. The first note stated, "Hey mom. Will, here. Just wanted to let you know I love you. I hope you had a good vacation. My new number is ------." On the lower portion of the same sheet of paper, the second note stated, "Will, for you. Had a great time. I will be coming up on Good Friday to go to church at noonish. Planning on having you join me, if you can, for that and Easter at Adventist. Let me know."

Vickie Maddox, an investigator with the Pulaski Police Department, also assisted in the investigation at the crime scene on Friday, April 21, 2000. She testified that, while she was there,

the Defendant came to the scene. She testified that "he first said he had just left the funeral home and that his family had told him that his mother had been shot in the head, and he wanted to know if we had any suspects, or if anything was taken from the house." She asked him when he was last at the house, and he told her that he had been there the previous Monday morning. The Defendant then stated that he was returning to the funeral home, and left the scene.

Lt. John Dickey, chief of the detective unit of the Pulaski police department, assumed charge of the investigation. He testified that he spoke with Dr. Harlan on Thursday, April 20. Dr. Harlan told him about the gunshot wound and described it as a "contact wound," that is, the barrel of the gun had been touching the victim's skin when it was fired. This initial report was consistent with a suicide. Lt. Dickey notified the family on Friday morning about the gunshot wound. Proceeding on the possibility of a suicide, Lt. Dickey determined that a search for the gun should be conducted near the victim's bed. As Lt. Dickey and his assistants cleared the significant amounts of debris from around the bed, they smelled gasoline near the floor. Lt. Dickey testified that, in addition, the feather bed on which the victim had been found was "reeking" with the smell of gasoline. The search failed to turn up a gun. Lt. Dickey testified that the lack of the gun together with the evidence of gasoline persuaded him that the victim's death was not a suicide but a homicide.

Lt. Dickey determined from Dr. Harlan that the bullet found in the victim's head was consistent with a .25 caliber. Lt. Dickey told his assistant investigator, Vickie Maddox, to have the Defendant come in to speak with them. Investigator Maddox subsequently went to the funeral home and asked the Defendant to come by the police station for an interview. The Defendant did so on the afternoon of Friday, April 21. Lt. Dickey interviewed the Defendant along with Investigator Maddox; Investigator Maddox testified that she took handwritten notes during the interview, but the discussion was not otherwise recorded. The Defendant reiterated that he had last seen his mother on Monday morning, after he had spent the night at the house on Sunday. After speaking with his mother on Monday morning at the school where she worked, he left and returned to Nashville.

Lt. Dickey asked the Defendant if he had any guns. The Defendant told Lt. Dickey that he did have a .25 caliber gun, but that he had purchased it that day. The Defendant showed the gun to Lt. Dickey, who kept it because the Defendant was carrying it without a permit. The Defendant also told the officers that he had earlier possessed another .25 caliber gun, but had lost it while fishing at Buchanan Creek the previous Saturday. He told Lt. Dickey that he had owned the previous gun for about two weeks, and that he had purchased it at Golden's Pawn in Lewisburg. Investigator Maddox testified that the Defendant told them that, after losing the gun, he threw the box of ammunition he had for it in a dumpster. Investigator Maddox also testified that, while they were talking, the Defendant said "he just wanted us to know he did not kill his mother; that they had a good relationship." He also told the officers that his mother had never mentioned feeling threatened by anyone.

The Defendant had arrived at the police station in his car. When asked by Lt. Dickey, the Defendant consented to have his car searched. Investigator Maddox and Lt. Glossop conducted the search of the Defendant's car. Investigator Maddox testified that, when she opened the car door, "the

odor of gasoline just kind of hit us real hard." She also noticed the smell of Lysol in the car's interior. In the back seat area of the car, she found a security guard uniform (consisting of a jacket, short sleeve shirt, and pants), a pair of jeans, a gray t-shirt, a pair of shoes, and a vacuum cleaner. Investigator Maddox testified that the uniform shirt smelled of gasoline. When Investigator Maddox opened the trunk of the Defendant's car, she found a plastic one-gallon gas can, a box of Tide, and some more shoes. When questioned about the car's contents, the Defendant explained that he had rented a U-Haul truck about a week earlier and it had run out of gas. He bought the gas can in order to put gas in the U-Haul and spilled it in the car. He stated that he had also spilled Lysol in the car. The police officers seized the Defendant's car as evidence. Lt. Dickey testified that a subsequent search revealed another gas can spout, designed for a larger gas container, an aerosol can of disinfectant spray, and an unopened cassette recording of "Canned Heat." Also found in the car was a receipt from Big Lots in Franklin dated April 19 at approximately 6:30 p.m. for a can of disinfectant spray and the cassette tape.

Lt. Dickey testified that the one-gallon plastic gas can had a spout that was stored inside the can. The cap that normally covers the opening where the spout is stored was missing.

The Defendant told Lt. Dickey that he had purchased the second .25 caliber gun "for protection." Lt. Dickey confirmed that the Defendant had moved from Murfreesboro to Nashville on April 11th and/or 12th and that his new apartment in Nashville was in an area where protection might be desirable. Lt. Dickey also confirmed that the Defendant had purchased his new pistol on that day. He discovered, however, that the Defendant had not purchased the previous pistol at Golden's Pawn in Lewisburg. Rather, the Defendant had purchased that gun at Pawns Unlimited in Lewisburg.

On cross-examination, Lt. Dickey admitted that no accelerant had been found by the TBI on any of the shoes found in the Defendant's car. He also admitted that the TBI had examined the Defendant's uniform for blood and found no blood on the jacket, shirt or pants. He acknowledged that the TBI had performed a gunshot residue test on the steering wheel of the Defendant's car, and the results were negative. He acknowledged that an ATM receipt recovered from the Defendant's apartment and dated April 16, 2000, showed an available balance of $940.93. Another receipt dated April 18 showed a remaining balance of $687.43. Lt. Dickey acknowledged that his investigation had revealed that the Defendant had received money from a trust fund at age 25 or 26, but that he did not know how much of that money remained.[1] Lt. Dickey also admitted that the Defendant's car was paid for and that he did not owe any rent money.

The police did not arrest the Defendant while he was at the station being interviewed. When he was ready to leave, the Defendant asked Investigator Maddox if she would give him a ride to the Star Motel. When she asked the Defendant if he would rather go to his family's house, the Defendant "said, no, he did not want his family [to] know that we were questioning him as a suspect on this, and he didn't want them to know we had taken his car."

---

[1]The Defendant was twenty-seven years old in April 2000.

Billy Calahan, owner of Pawns Unlimited in Lewisburg, testified that he took in a .25 PIC pistol, model 1025, from a Harold Miller in early 2000. Mr. Harold Miller also testified that he sold the .25 PIC to Billy Calahan in mid-January, 2000. He testified that he sold it because it occasionally malfunctioned. Prior to selling it, he fired it several times into the ground at his home. Mr. Miller testified that the TBI recovered one of the bullets he had fired into the ground from the .25 PIC pistol that he later sold to Pawns Unlimited. Patricia Calahan, Mr. Calahan's wife, testified that she sold the .25 PIC semiautomatic pistol to the Defendant on April 14, 2000.

TBI agents Wayne Wesson and Vance Jack testified that they recovered one .25 bullet from the ground at Mr. Miller's home. They also recovered three other .25 bullets from an old appliance door, at which Mr. Miller had fired other guns. These four bullets were turned over to the TBI lab.

Steve Scott, an agent with the TBI firearms identification unit, testified that he tested all four bullets recovered from Mr. Miller's residence, as well as the bullet recovered from the victim. Agent Scott testified that the bullet from the victim's body and the bullet recovered from the ground at Mr. Miller's home were fired from the same gun. Agent Scott testified that he was "100% positive" that these two bullets had been fired from the same gun. Agent Scott also testified that the other three bullets, recovered from the appliance door at Mr. Miller's house, had not been fired from that gun. Agent Dan Royce, also with the TBI firearms identification unit, testified that he, too, had examined the bullets, and reached the same conclusions as Agent Scott.

Tara Barker is a forensic scientist with the TBI, working in the area of fire debris analysis. She testified that her testing procedures revealed the presence of a gasoline range product on the uniform shirt and uniform pants found in the Defendant's car. She obtained the same results on the driver's floor mat, the passenger rear floor mat, and the carpet of the driver's side floor. Her testing procedures also revealed the presence of a gasoline range product on the pillowcase from the victim's bedroom, as well as on feathers collected from the featherbed, the victim's gown, and samples taken from the floor around the victim's bed. She could not determine, however, if the gasoline range product on all of these items was the same. Ms. Barker also testified that, under normal conditions, gasoline totally evaporates in seven to ten days.

Robert Watson, with the State Fire Marshall's office, visited the scene and determined that the upstairs and downstairs fires had been separately set. He testified that flammable liquid burn patterns were found at both locations. He further testified that both fires had been deliberately set.

Santiago McKlean managed the U-Haul location where the Defendant rented a U-Haul truck on April 11, 2000. Mr. McKlean testified that the rental had been for twenty-four hours. The U-Haul truck rented by the Defendant had a diesel engine and its fuel tank was almost one-half full when the Defendant took possession of it. Mr. McKlean stated that the Defendant came in around the fourteenth of April, complaining that the truck had broken down. The Defendant explained that he had put gasoline in the truck. Mr. McKlean testified that, if gasoline instead of diesel were put in the fuel tank, the truck would run about ten minutes and then die. The Defendant told Mr.

McKlean where the truck was and Mr. McKlean dispatched a tow truck to pick it up. After the truck was returned, Mr. McKlean determined that the Defendant had driven the truck about eighty miles.

Mr. Tom Powers was the tow-truck operator sent to pick up the U-Haul. Mr. Powers testified that he drove to the location specified by the Defendant, but the truck was not there. Eventually, Mr. Powers located the truck at a Metro impound location. When Mr. Powers got the truck back to his shop, he determined that the truck would not run because it had gasoline in the fuel system instead of diesel. He drained almost nineteen gallons of fuel from the tank, most of it gasoline. In the truck, Mr. Powers found a two-gallon gasoline container. The Defendant signed an agreement to pay for the repairs to the U-Haul truck on April 17, 2000.

The Defendant was arrested on April 26 at his apartment. During the ride to the station, the Defendant conversed with the police officers transporting him. This conversation was recorded and played for the jury. A transcript had also been prepared and was provided to the jury and is in the record before this Court. At the beginning of the trip, Investigator Brandon Beard told the Defendant that he was charged with aggravated arson and first degree murder, and that there was "no bond on it." To this information, the Defendant responded, "Ah man, bad." A little later, the Defendant stated, "Ah man I can't believe this." When Investigator Joel Robison asked, "What's that?", the Defendant said, "I just can't believe this. They haven't turned up anything else or anything different or?" Investigator Robison then said, "They haven't turned up anything else what?" The Defendant replied, "I don't know, never mind. I probably shouldn't. I just can't believe this." Some time later, the Defendant asked Investigator Robison, "You mind if I ask you a question?" Investigator Robison said, "Go ahead man." The Defendant then asked, "Do they think they have enough evidence for a trial against me or, they just, am I just?" Investigator Robison responded, "Nah, yeah, they think they do (inaudible). If they didn't we wouldn't be coming up here to pick you up." The Defendant then stated, "I could understand them once they searched my apartment, but I mean . . . " Later, the Defendant stated that he had told his employer that he "was going to need the next two weeks to a month off." The Defendant continued, "Yeah, I hope to gosh this will get straightened out before then." Later, the Defendant asked, "Hey [Investigator Robison], you don't know if they got any other suspects do you?" The investigator responded, "Not at this time they don't." When Investigator Robison later asked if the Defendant was all right, the Defendant stated, "yeah, I'll make it, man. If you got something to stop for." When Robison replied, "Huh?", the Defendant said, "If you got something to stop for, I would get out."

Officer Turner testified that he fingerprinted the Defendant after his arrest. When another officer read the charges to the Defendant, the Defendant stated, "Huh, I just can't believe they think they have enough evidence to go forward with this in a trial."

After he was arrested, Lt. Dickey and other police officers searched the Defendant's apartment. There, they found a receipt dated April 14 for the purchase of .25 ammunition; U-Haul receipts dated April 11 and April 17; and a receipt from Gun City for the purchase of the replacement .25 on April 21.

Tracy Majors was the Defendant's supervisor at Dynamic Security Services where the Defendant worked as a guard at the Deloitte and Touche building east of the Nashville airport. Mr. Majors testified that the Defendant worked the five p.m. to midnight shift, Monday through Friday. Mr. Majors stated that it was company policy to keep a flashlight at the security desk on that site. At some point prior to the fire, Mr. Majors testified, the flashlight was missing. However, the Defendant returned the flashlight on Monday, April 24. Mr. Majors testified that the time sheets indicated that the Defendant had reported to work at 5 p.m. on Tuesday, April 18, and that he left at midnight that night.

Mary Burden worked the same shift as the Defendant. She testified that the Defendant stayed on his shift until midnight on Tuesday night and that he had been wearing his uniform that night. She also stated that it took about one hour and forty minutes to drive from her workplace to Pulaski. Ms. Burden testified that the Defendant returned the missing flashlight after the victim's death.

Bruce Asher also worked with the Defendant. He testified that he received a call from the Defendant's father on Wednesday, April 19, telling him that the Defendant's mother had died, and the Defendant needed to call as soon as he could. When the Defendant reported for work on Wednesday, Mr. Asher told the Defendant to call his father; Mr. Asher did not tell the Defendant the news of his mother. Mr. Asher was standing nearby when the Defendant called his father. Mr. Asher said that the Defendant had "no reaction" during the phone call, and wore "just a blank expression." Mr. Asher stated that the Defendant's phone call with his father lasted less than five minutes. The Defendant left work after the phone call.

Mr. Asher stated that the company issued two pairs of uniform pants and two uniform shirts to the guards. Mr. Asher also testified that he noticed no strange odors about the Defendant while he was standing nearby.

James Ed Jones, Jr. testified that he saw the Defendant at a gas station on the Saturday afternoon before the fire. He asked the Defendant what he had been up to, and the Defendant told him that he had been "out to the farm, shooting his gun." Mr. Jones asked to see the Defendant's gun and the Defendant showed him a small caliber pistol. The Defendant told Mr. Jones that he had the gun for protection. Mr. Jones responded by telling the Defendant that the gun "wasn't much" and that he would have to hit someone in a vital organ with it, or risk just making the person mad.

Margaret Bush, a TBI forensic serologist, testified that she tested the uniform shirt, jacket and pants found in the Defendant's car for bloodstains. She testified that she found no bloodstains on any of these items of clothing. She also testified that the items had not been laundered. She described the shirt as short-sleeved.

Dr. Harlan performed the autopsy on the victim. He testified that the cause of death was a gunshot wound to the right temple. He described the wound as a "contact" gunshot wound, meaning that the barrel of the gun had been in contact with the victim's skin when it was fired. Dr. Harlan

testified that the victim had been dead when the fire began. He further testified that, in gunshot wounds such as this one, less than ten percent would involve blood spatter.

Ed Hueske is a forensic consultant and testified on behalf of the Defendant. He agreed with the State's ballistics experts that the bullet found in the victim and the bullet recovered from the ground at Mr. Miller's house had been fired from the same gun. However, he also testified that he would expect blood spatter on the coat sleeve of the shooter. He based his opinion on tests he performed firing a .25 caliber pistol into an artificial head designed to mimic a human head. However, he put no hair on the artificial head, and conceded that the presence of hair could impede any spatter.

The Defendant also introduced proof that he had over $8,000 in an investment account as of April 17, 2000. Finally, he introduced evidence of the divorce proceedings between his parents, and of the victim's attempts to collect monies from the Defendant's father pursuant to his bankruptcy proceedings.

## MOTION TO SUPPRESS

The Defendant complains that the trial court committed reversible error in denying his pretrial motion to suppress the evidence recovered incident to the searches of his car. The Defendant's car was initially searched at the police station during the Defendant's interview with Lt. Dickey and Investigator Maddox. This search was conducted without a search warrant. The Defendant contends that the search was unconstitutional because there were no "exigent circumstances." See generally Fuqua v. Armour, 543 S.W.2d 64, 66 (Tenn. 1976). A subsequent search was conducted at the TBI crime lab pursuant to a search warrant. The Defendant argues that the warrant was issued in reliance upon information gleaned from the initial illegal search. Accordingly, he argues, none of the evidence seized from the vehicle was admissible at trial. The State responds that the initial search was conducted with the Defendant's consent and was therefore valid, as was the subsequent search pursuant to the warrant.

We acknowledge, of course, that a warrantless search or seizure is presumed to be unreasonable, and the resulting evidence is subject to suppression unless the State demonstrates that the search was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. See State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). One exception is a search conducted pursuant to a person's consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 248, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973). The consent must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)). It is not necessary for the officer to inform the person of the person's right to refuse consent. See United States v. Drayton, 536 U.S. 194, 206, 122 S. Ct. 2105, 2113-14, 153 L. Ed.2d. 242 (2002).

In this case, the trial court denied the Defendant's motion to suppress on the grounds that the initial search had been conducted with the Defendant's consent. The trial court further found that "there is nothing wrong with the search warrant." Our supreme court instructs us that, "in evaluating

the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

Our review of the record reveals that both Lt. Dickey and Investigator Maddox testified that the Defendant consented to having his vehicle searched while he was being interviewed by them. No evidence contradicts this testimony. Obviously, the trial court found the officers to be credible witnesses. Thus, the evidence adduced at the hearing on the suppression motion and at the trial supports the trial court's conclusion that the Defendant consented to having his car searched during his interview with Lt. Dickey and Investigator Maddox. The initial search was therefore valid and the Defendant's argument regarding "exigent circumstances" is misplaced and without merit. Furthermore, because the initial search was consensual, the Defendant's argument that the subsequent search warrant must fail is also without merit. The Defendant is entitled to no relief on this issue.

## SPEEDY TRIAL

The Defendant complains that he was denied his right to a speedy trial. The State disagrees, pointing out that the Defendant was tried approximately ten months after his arrest. We agree with the State on this issue.

A criminal defendant is entitled to a speedy trial under both the United States and Tennessee constitutions. See U.S. Const. Amend. VI; Tenn. Const. Art. I, § 9. See also Tenn. Code Ann. § 40-14-101. The right to a speedy trial is "designed to protect the accused from oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that the accused's defense will be impaired by dimming memories or lost evidence." State v. Simmons, 54 S.W.3d 755, 758 (Tenn. 2001). A four-factor balancing test must be applied when evaluating a defendant's claim that his or her right to a speedy trial has been violated. See Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed.2d 101 (1972); State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973). These factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) the prejudice suffered by the defendant from the delay. See Simmons, 54 S.W.3d at 759. However, unless the length of the delay is "presumptively prejudicial," we need not address the remaining three factors. See id.

"Generally, post-accusation delay must approach one year to trigger a speedy trial inquiry." Id. However, the reasonableness of the length of the delay depends upon the complexity and nature of the case. See id. The presumption that the delay has prejudiced the accused intensifies over time. See id. Here, the Defendant was arrested on April 26, 2000. His trial began on February 12, 2001. This is a delay of less than ten months. The Defendant was charged with first degree premeditated murder and aggravated arson. That is, the charges against the Defendant were serious, requiring significant investigation and trial preparation. Under the facts of this case, we hold that the delay between the Defendant's arrest and his trial was not "presumptively prejudicial." Accordingly, we

need not address the remaining factors relevant to a claim that the speedy trial right has been violated. This issue is without merit.

## JURY SEQUESTRATION

This case was tried before a sequestered jury. After the jury was selected, but before the jury was sworn, some of the individual jurors were allowed to drive their cars home and pick up the items they needed for the period of their sequestration. Each of these jurors was followed to his or her home by a sworn deputy of the court; in the car with each deputy were two other jurors. When the driving juror arrived at his or her home, the following deputy left his car and accompanied the individual juror into his or her home while the jurors in the car waited. All of these jurors were then driven to their motel by the deputy in the deputy's car. The next morning, the jurors were returned to the court by the deputies and sworn.

After opening statements, the preceding facts were brought to the trial court's attention and the Defendant moved for a mistrial. The trial court heard testimony from one of the court officers as well as from the court clerk who swore the deputies in. The judge overruled the Defendant's motion, stating "I'm satisfied that it was done accurately [and] I don't have any problem with it." The Defendant now complains that the "jury sequestration rule was breached" and he is therefore entitled to a new trial. The State disagrees.

Our criminal code provides that, when a jury is sequestered, the trial court "shall prohibit the jurors from separating at times when they are not engaged upon the actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116. The purpose of the sequestration rule is "to preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial." State v. Bondurant, 4 S.W.3d 662, 671 (Tenn. 1999). However, a trial judge has the discretion to allow the separation of tentatively selected jurors prior to the time the jurors are sworn to try the case, so long as appropriate admonitions are administered. See State v. McKay, 680 S.W.2d 447, 453 (Tenn. 1984). Where such separation occurs, as it did in this case, "it is not grounds for reversal or a new trial unless it can be affirmatively shown that prejudice resulted from the separation." Id.

In this case, before the jurors left the courthouse on the evening before they were sworn, the trial judge instructed them not to discuss the case among themselves; not to allow anyone to discuss the case with them; and not to "read, listen, or watch any media accounts of this hearing." During the brief hearing on this matter, there was no evidence adduced demonstrating that any prejudice had resulted from the jurors' separation. Nor was there any evidence to this effect adduced at the motion for new trial. Accordingly, no grounds for reversal or a new trial have been established, and this issue is therefore without merit.

## TENNESSEE RULE OF EVIDENCE 106 AND MOMON ERRORS

The Defendant complains that the trial court committed reversible error when it admitted in its entirety the fifteen-page police report prepared by Investigator Vickie Maddox following her investigation of the crimes. On direct examination, Investigator Maddox testified about her brief

meeting with the Defendant at the crime scene on Friday, about the Defendant's subsequent meeting with her and Lt. Dickey at the station later that day, and about her search of the Defendant's car. On cross-examination, defense counsel questioned Investigator Maddox about certain information contained in her police report summarizing her investigation. In response to these questions, she acknowledged that her investigation had revealed that the victim never locked her front door; that the victim had gone to work on Tuesday the 18th and had appeared happy; that the Defendant had visited her there on Tuesday morning and that no cross words had been overheard; that she had talked to over twenty people during the course of her investigation; and that she had attempted to recreate the last days of the victim's life. She explained that the Defendant had initially told her that the last time he had seen his mother was on Monday morning, the 17th, but that he had later corrected himself and stated that he had spent Monday night at her house and saw her on Tuesday morning. On redirect, the State requested that the whole of Investigator Maddox's report be admitted and shown to the jury. Over strong protest by the defense, the trial court admitted the report.

The report is significant because it contains the only allegations of what may have led the Defendant to kill his mother. Specifically, the report contains the following:

a statement by the victim's therapist that the victim was concerned about the Defendant's "mental illness" and did not know what to do about his problem;

a statement by one of the Defendant's co-workers describing him as "a quiet person but . . . a little weird, " "was on medication for his nerves," and "always nervous";

a statement by the Defendant's supervisor that the Defendant had lied about two complaints lodged against him by female co-workers;

a statement by a shoe store employee that she had overheard an unidentified speaker say that the Defendant "was not who he appeared to be";

a statement by the victim's friend Betty Clark that the Defendant was referred to as the "lost sheep," and that the victim had told Ms. Clark that she "had washed her hands of giving [the Defendant] money and that she was turning him over to God";

a statement by Betty Clark's daughter Casey Clarke that Minde Aymett told her that the Defendant told her that he did not care anything about his mother and just wanted the money;

a statement by the victim's friend Charlotte Lord that the victim and the Defendant's sister were afraid of the Defendant because he was verbally abusive and threatening; that the victim told her that sometime after Christmas she had told the Defendant she would not give him any more money and later found the Defendant at the top of the stairs with a gun, threatening to kill himself, and that when she told the Defendant

-11-

he could not kill himself in her house, he left, saying that he had no intentions of killing himself. Ms. Lord also stated that the Defendant had been on medication but was trying to stop taking it because of the expense;

a statement by Kathryn Vaughan, the Defendant's sister, that the Defendant had "gone through a phase of manic depression" two years earlier, that the Defendant took medication, but she did not know what, and that the Defendant "wasn't stable."

Obviously, the report contains a great deal of hearsay, and some examples of hearsay within hearsay. The Defendant's right to confront witnesses against him is clearly implicated. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Nevertheless, the trial court admitted the report on the basis of Tennessee Rule of Evidence 106, which provides that "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The trial court also relied on this Court's opinion in State v. Willis M. Herndon, No. 84-223-III, (Tenn. Crim. App., Nashville, April 16, 1985). In that case, which was decided prior to the adoption of Tennessee Rule of Evidence 106, this Court adopted the essentially identical Federal Rule of Evidence 106 "as an expression of the modern view of the admissibility of evidence at trial." Importantly, however, this Court also advised that the adoption did not create a blanket rule of admission, and that the "trial court retains a responsibility to examine the remainder of the statement in question in order to determine whether it contains relevant evidence, the probative value of which outweighs any prejudicial effect."

The Tennessee Rules of Evidence took effect on January 1, 1990. Our supreme court has since stated that "the rule of completeness [embodied by Rule 106] reflects a concern for fairness and allows the trier of fact to assess related information at the same time rather than piecemeal." State v. Torres, 82 S.W.3d 236, 252 (Tenn. 2002). Thus, it is a rule of timing rather than admissibility: "Rule 106 simply gives the trial judge the discretion to let one party have evidence introduced during another party's proof." Neil P. Cohen et al., Tennessee Law of Evidence § 1.06(3)(c) (LEXIS 4th ed. 2000). As this Court has previously recognized, Rule 106 addresses two concerns: (1) the misleading impression created by taking matters out of context, and (2) the inadequacy of repair work when the admission of the disputed proof is delayed to a point later in the trial. See State v. William Pierre Torres, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *32 (Tenn. Crim. App., Knoxville, Mar. 13, 2001), rev'd on other grounds, State v. Torres, 82 S.W.3d 236 (Tenn. 2002). The Rule is circumscribed by two qualifications: the evidence proffered pursuant to the Rule must (1) be relevant, and (2) explain or qualify proof already admitted. See id., citing United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996) and United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988). In effect, Rule 106 provides an adverse party a mechanism for putting portions of writings into context, if the portions would otherwise be misleading.

-12-

In all events, the standard for employing Rule 106 is ultimately one of fairness. Accordingly, the most important factor in determining whether Rule 106 should be invoked is whether the jury's accurate understanding of the evidence already admitted requires the admission of this additional information. See Cohen, § 1.06(2)(b). Thus, our federal courts require that the material sought to be admitted under the substantially identical Federal Rule of Evidence 106 does at least one of the following: (1) explains the already-admitted proof; (2) places the admitted proof in context; (3) avoids misleading the trier of fact; or (4) ensures a fair and impartial understanding of the already-admitted proof. See, e.g., Glover, 101 F.3d at 1190; Unites States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984); see also State v. Keough, 18 S.W.3d 175, 182 (Tenn. 2000) (holding that Rule 106 reflects a concern for fairness in that it permits the trier of fact to assess related information without being misled by hearing only certain portions of evidence). We will reverse a trial court's determination under Rule 106 only upon an abuse of discretion. See Keough, 18 S.W.3d at 183.

During defense counsel's cross-examination of Investigator Maddox, he confirmed that she had spoken to over twenty persons during her investigation, including a number of the victim's neighbors, and that she had learned that the victim left her front door unlocked. Defense counsel also confirmed that her investigation had indicated that nothing had been "wrong with" the victim on the 18th; that the victim had returned to her home from a trip on Monday night, the 17th and that the Defendant had spent that night at the house; and that her investigation had revealed no indication that the Defendant had been in financial trouble. Defense counsel established that Investigator Maddox's investigation had confirmed many of the things that the Defendant had told her during their talks. He established that she had spoken with Joyce McCurry, one of the victim's coworkers, and learned that the Defendant had visited his mother Tuesday morning at school and that Ms. McCurry had overheard no cross words between them. Defense counsel questioned Investigator Maddox's recollection about her efforts to speak with a Betty Higgins. He also questioned her about her efforts to discover the occupants of a vehicle which neighbors reported seeing at the scene shortly after the fire began. He questioned her about her failure to investigate the victim's attempts to collect alimony from the Defendant's father, even during his bankruptcy proceedings, and her failure to question the Defendant's father.

At the close of cross-examination, the prosecutor asked to admit the entirety of Investigator Maddox's written report on the basis that defense counsel had "opened the door" by questioning her about her report, and also asking questions relative to the Defendant's motive, or lack thereof. Over defense counsel's objection, the trial court allowed the entire statement to be read into the record, and the actual report admitted as an exhibit. In doing so, we must conclude that the trial court abused its discretion.

A careful reading of defense counsel's cross-examination of Investigator Maddox reveals that he was questioning the thoroughness of her investigation insofar as pursuing other possible suspects; the accuracy of her transcription of what she was told by various persons; that she could have recorded the Defendant's interview at the station, but did not; and that her investigation confirmed much of what the Defendant told her. In short, defense counsel was trying to create some suspicion in the jurors' minds that someone else may have committed these crimes, but the police investigation

-13-

was inadequate to discover other suspects. Additionally, defense counsel was trying to raise an issue about Investigator Maddox's credibility insofar as the accuracy of her memory and transcription.

During his cross-examination, defense counsel referred only twice to specific lines in Investigator Maddox's report. At no time did he proffer any portion of the report as substantive evidence. Yet, on its face Rule 106 refers to the <u>introduction of a portion of a writing by a party to the litigation.</u>[2] More importantly, defense counsel's numerous references to the information in the report were not taken out of context and did not create any danger that the jury would be misled if other portions of the report were not admitted contemporaneously. At one point, defense counsel established that Investigator Maddox had recorded something incorrectly in her report. Since Investigator Maddox admitted the error, introduction of the entire report was in no way helpful. Nor was there anything in the report to contradict or illuminate any of the points which defense counsel made during his cross-examination of Investigator Maddox.

The prosecutor argued to the trial court that defense counsel had "opened the door" to Investigator Maddox's investigation concerning the Defendant's motives in committing these crimes. We disagree. Defense counsel sought to establish that the Defendant and his mother had been on friendly terms immediately before the fire; nothing in Investigator Maddox's report contradicted this notion. Defense counsel also sought to establish that Investigator Maddox had found nothing to indicate that the Defendant was in financial trouble. The rank hearsay contained in Investigator Maddox's report about the Defendant's alleged desire to obtain money from or through his mother did not contradict or explain or illuminate the Defendant's financial condition: the only thing which defense counsel inquired about. Furthermore, <u>nothing</u> in defense counsel's cross-examination of Investigator Maddox required that the jury be informed about what Investigator Maddox had been told about the Defendant's alleged mental condition.

In short, the trial court committed a significant trial error by allowing Investigator Maddox's entire report to be admitted into evidence in violation of the Defendant's constitutional right to confront the witnesses against him. <u>See</u> U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This is not the only error of constitutional magnitude marring the Defendant's trial. An error also occurred in violation of our supreme court's instructions in <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn. 1999), regarding the Defendant's right to testify. <u>Momon</u> instructs us that a criminal defendant's right to testify is a fundamental right under our state and federal constitutions. <u>See id.</u> at 161. Accordingly, the right must be personally waived by the defendant. <u>See id.</u> To ensure that the defendant's right to testify has been personally waived by the defendant, our supreme court adopted in <u>Momon</u> procedural guidelines that call for defense counsel to request a jury-out hearing to demonstrate that the defendant's waiver of the right to testify has been knowingly, intelligently, and voluntarily made. <u>See id.</u> at 162. The trial judge has a duty to ensure that a criminal defendant personally waives the right to testify. <u>See id.</u> at 169.

---

[2]We acknowledge that this Court has previously held that a cross-examination in extensive detail about a witness's prior statement is tantamount to an introduction of the statement for Rule 106 purposes. <u>See</u> <u>State v. Belser</u>, 945 S.W.2d 776, 788 (Tenn. Crim. App. 1996).

In this case, the procedural guidelines established by <u>Momon</u> were not followed. The Defendant did not testify at his trial. Furthermore, there is no evidence in the record to establish that the right was otherwise personally waived by the Defendant. <u>See</u> <u>id.</u> at 163. To the contrary, at the hearing on the motion for new trial, the Defendant testified that he had wanted to testify at trial and that he repeatedly told his two trial lawyers that he wanted to testify. He stated that his lead lawyer, Mr. Russ Parkes, never prepared him for direct examination and only once, for a period of fifteen minutes, worked on cross-examination. After these few minutes, Mr. Parkes told the Defendant that he would be a poor witness. Although the Defendant tried to broach the topic later in trial preparations, Mr. Parkes "always . . . said it was in [his] best interest not to testify." The Defendant stated that Mr. Parkes never explained to him that the ultimate decision about testifying was his, rather than his lawyer's. The Defendant testified at the new trial hearing that he thought the decision was Mr. Parke's to make. Although the Defendant's trial lawyer testified at the new trial hearing, he was not questioned by anyone about his discussions with the Defendant about the Defendant taking the witness stand. Because the State put on no proof that refuted the Defendant's testimony that he did not personally waive his right to testify, we must conclude that the Defendant's fundamental right to testify was violated.

Although a criminal defendant's right to testify is a fundamental constitutional right, the violation of that right is subject to constitutional harmless error analysis. <u>See</u> <u>Momon</u>, 18 S.W.3d at 167. That is, "the burden is upon the State to prove that the constitutional right violation is harmless beyond a reasonable doubt." <u>Id.</u> Factors impacting upon the harmless error analysis include (1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the defendant's testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and (4) the overall strength of the prosecution's case. <u>See</u> <u>id.</u> at 168. These four factors "are merely instructive and not exclusive considerations." <u>Id.</u> "[T]he goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict." <u>Id.</u>

The Defendant in this case did not testify at trial; he did, however, testify at the hearing on his motion for new trial. At that hearing, he testified about what he would have told the jury had he testified at trial. According to the Defendant, he would have testified to the following:

He did not shoot and kill his mother, and he did not set fire to her house.

He had had his first .25 pistol with him while fishing at Buchanan Creek on Saturday, but left it along with a box of bullets and his green backpack at his mother's house in the utility room later that day. He told this to Lt. Dickey. He also told Lt. Dickey that he had dumped the box of bullets in the backpack, not in a dumpster.

He spent the night at his mother's house on Saturday and did not take the gun with him when he left the next day. He planned on returning the gun to the pawnshop because it had been malfunctioning. However, he "just never got around to" returning the gun before the fire.

-15-

The gas can found in his car was the one he used to put gas in the U-Haul. It was missing the spout cap. It was partially full because, given the odd angle of the fill-tube in the U-Haul, it was not possible to completely empty the gas can while putting gas in the truck. The gas can rolled over on his uniform while he had the uniform stored in the trunk of his car, and that is why the uniform had gasoline on it.

He made several trips to a gas station on the night the U-Haul broke down. He tried to restart the truck over the course of the next two days. The wrecker did not come for the truck until two days after that. He made about ten trips to the gas station to keep putting gas in the U-Haul because he thought the gas line was leaking. He imagined the gas spilled several times during his efforts to restart the truck.

He lost the spout cap to the gas can on the day of the breakdown. The loss of the cap was responsible for the gasoline getting on his uniform and car floor mats. The other reason for gas being found on his car floor mats was from his walking around gas stations.

He believed the gas must have gotten on his uniform after the fire, because he was wearing the uniform the day after the fire and Bruce Asher noticed no smells. It followed that he did not wear a uniform covered and smelling like gas to work. He had moved his uniform from the trunk of his car to the backseat on the same Friday that the police searched his car, to prevent future spills and to remind him to launder the uniform.

His mother left the front door of the house unlocked. That is how he came and went. She kept three jugs of gasoline under the deck in the back for use in the lawn mower and weed eater.

He had been carrying the flashlight in his car because he needed it to assist Deloitte and Touche employees while they were getting in their cars at a remote parking location.

After he got off work on Tuesday night at midnight, he went home to his Nashville apartment and went to bed.

The extra gas spout found in his car was one he had found at a gas station and picked up in order to use as an oil funnel for his car, which was burning oil at the time.

After the fire, he searched the house for the gun, bullets and backpack, but never found them. He surmises whoever committed the crimes took these items.

During his interview with Lt. Dickey, he surmised he may have left his gun at the creek because he had not been able to find it in the house. However, since the

-16-

interview, he had been able to "positively recall" that he had left the gun at his mother's house. He originally told Lt. Dickey that he thought he had left the gun there, but when Lt. Dickey asked where the gun was now, he thought that maybe he had left it at the creek, since no one had found it at the house. He reiterated that, what he did know was that he did not use the gun to kill his mother.

On cross-examination, the Defendant explained that he had purchased the second gun for protection because of the area in which he was then living in Nashville. He knew he was "wasting his time" with the other gun because it had been malfunctioning. He had no idea he was going to be arrested at the time he purchased the second gun.

Although the Momon issue was specifically raised in the motion for new trial, and although the Defendant put on proof regarding this issue during the hearing on the motion for new trial, the trial judge made no mention of Momon or the constitutional right at issue in either his ruling from the bench at the conclusion of the hearing, or in the order he filed denying the motion for new trial. The trial court's failure in this regard is both troubling and significant. In order to determine whether the constitutional error was harmless beyond a reasonable doubt, we must determine the importance of the Defendant's testimony to his case. Obviously, a denial by a criminal defendant that he committed the crimes with which he is charged can be of pivotal importance to his case. The level of importance will hinge, however, on the defendant's credibility. If the defendant's credibility is nil, his testimony will be of similar significance. If, on the other hand, a defendant's credibility is great, his testimony will be crucial. Yet, in this case, the trial court made no findings whatsoever with respect to the Defendant's claim that he had been deprived of his fundamental constitutional right to testify. Given that this is a court of appellate jurisdiction, we are precluded from making judgments of credibility. Accordingly, we cannot simply assume that none of the jurors would have believed the Defendant's testimony, or, after hearing him testify, had a reasonable doubt of his guilt.

Turning to the remaining three Momon factors, we note that most of the Defendant's testimony was cumulative to other evidence adduced at trial. Investigator Maddox testified that, during the Defendant's interview with her and Lt. Dickey, the Defendant told them that he had not killed his mother. He explained the presence of gasoline in his car as related to the breakdown of the U-Haul. He told them that he had purchased the new pistol for protection. The only significant factual statement testified to by the Defendant that did not come out at trial by some other means was his statement that he positively remembered having left the gun that killed his mother at her house on Saturday night. On this piece of testimony hinged the Defendant's claim that someone else had come into his mother's house, found the gun, and shot and killed her with it.

Not only was much of the Defendant's testimony cumulative to what had been introduced at trial, it was also substantially corroborated by other proof. Tom Powers testified that the U-Haul truck rented by the Defendant had almost nineteen gallons of gasoline in it, corroborating the Defendant's testimony that he had made multiple trips to the U-Haul from a gas station in order to

keep putting gas in it. Harold Miller, the prior owner of the gun that killed the victim, testified that the pistol had malfunctioned while he owned it; hence, his pawning it at Pawns Unlimited.

There was no proof at trial which actually contradicted the Defendant's version of events. However, key pieces of evidence allowed for different conclusions. Bruce Asher, one of the Defendant's co-workers, testified that they were issued two security uniforms. Thus, the jury could have reasonably concluded that the Defendant was wearing his other uniform while speaking with his father on Wednesday afternoon while Mr. Asher stood by, rather than accepting the Defendant's explanation that he must have spilled gas on his uniform after this point, because Mr. Asher would otherwise have noticed the gasoline smell. Tracy Majors corroborated the Defendant's testimony that the security guards were expected to use the flashlight to assist Deloitte and Touche employees, but he also testified that the security firm's policy was to keep the flashlight at the security desk. Thus, the Defendant was not supposed to have the flashlight in his possession after he left work. Nevertheless, the Defendant did retain possession of the flashlight for some period of time before the fire, not returning it until the following Monday.

The Defendant offered no explanation for the presence of the two-gallon gasoline container found in the U-Haul truck. However, the State put on proof that the orphan gas can spout found in the Defendant's car might have fit this larger gasoline container. Obviously, the jury could have reasonably inferred that the Defendant used the gas can found in the U-Haul for putting gas in it, and that he used the gas can found in his car for the purpose of spreading gasoline at his mother's house. Also, the Defendant offered no explanation for his remarks during his ride to the police station after his arrest. Nor did the Defendant offer any explanation as to his lack of any emotional response following the announcement of his mother's death, or for his purchases on the way home after that announcement of disinfectant and a cassette of "Canned Heat." Finally, the Defendant offered no explanation as to why he told the police that he had purchased the murder weapon at a nonexistent pawn shop.

The Defendant rented the U-Haul on April 11 for twenty-four hours. It broke down and, according to his testimony, he spent the next two days, April 12 and 13, trying to restart it by putting gasoline in it. Proof at trial established that gasoline completely evaporates in seven to ten days. Thus, any gasoline the Defendant spilled on his uniform and/or his car on the 13th should have been completely evaporated by no later than the 23rd. Yet, according to Lt. Dickey and Investigator Maddox, the Defendant's car and uniform still smelled very strongly of gasoline on the afternoon of the 21st.

We acknowledge, of course, that the State's case against the Defendant was entirely circumstantial. Nevertheless, the State's case was strong and certainly entitled the jury to convict the Defendant as charged. Yet, the Defendant had a constitutional right to testify and deny his guilt. We are concerned that, if the Defendant had been a credible witness, at least one of the jurors would have accepted his testimony and refused to find him guilty.

-18-

The violation of the Defendant's constitutional right to testify is compounded by the erroneous admission of Investigator Maddox's report. On the one hand, the jury heard inadmissible evidence describing the Defendant as mentally ill, unstable, threatening, armed and untruthful. On the other hand, the Defendant was prevented from telling the jury that he was innocent of the crimes for which he was being tried. Obviously, he was also prevented from responding to the allegations contained in Investigator Maddox's report. As our supreme court has recognized,

> An innocent person is sometimes entangled in a web of suspicion by a curious combination of facts, which no one else can explain but himself . . . . He alone may be able by a simple explanation of circumstances[,] which now seem inexplicable otherwise than upon assumption of guilt, or by putting this and that fact together, to remove every shadow of suspicion from himself.

Momon, 18 S.W.3d at 158 (quoting Wilson v. State, 3 Heiskell 198, 206, 50 Tenn. 232, 241 (Tenn. 1871)). As set forth above, when an error of constitutional dimensions is committed, it is the State's burden to demonstrate that the error was harmless beyond a reasonable doubt. That is, the State must demonstrate that the error complained of -- here, the violation of the Defendant's right to testify -- "did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L. Ed. 2d 705 (1967). On the facts of this case, however, we simply cannot say that the Defendant's thwarted desire to testify did not contribute to the jury's verdict of guilt. Accordingly, we have no choice but to vacate the Defendant's convictions and remand this cause for a new trial.

## SUFFICIENCY OF THE EVIDENCE

Although we are vacating the Defendant's convictions and remanding this case for a new trial, we will address the Defendant's contentions regarding the sufficiency of the evidence in order to facilitate any further appellate review.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. See Evans, 838 S.W.2d at 191; see also

Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). "The element of premeditation is a question of fact to be resolved by the jury." State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be established by proof of the circumstances surrounding the killing. See id. Factors which tend to support the existence of premeditation include the use of a deadly weapon upon an unarmed victim, evidence of procurement of a weapon, and preparations before the killing for concealment of the crime. See id.

In this case, all of the proof of the Defendant's involvement in the crimes was circumstantial. However, "[a] conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)).

The State's proof established beyond a reasonable doubt that the victim was shot with a gun purchased by the Defendant on Friday, April 14, 2000. The Defendant told investigators Maddox and Dickey that he had lost the gun the next day while fishing. However, the Defendant showed the gun to a friend of his on Saturday afternoon, saying that he had been shooting it at a farm. The gun was never recovered. The proof also established beyond a reasonable doubt that gasoline was poured around and on the victim's bed and then set aflame. Pieces of the Defendant's clothing found in his car less than seventy-two hours after the fire tested positively for the presence of gasoline. Flooring in the Defendant's car also tested positively for gasoline. The Defendant's car smelled of gasoline and also smelled as though it had been sprayed with disinfectant purchased after the fire had been set.

The clothing found in the Defendant's car which tested positively for gasoline were pieces of a uniform that the Defendant wore for work. Coworkers established that the Defendant had been on the job until midnight on the night of the fire, and that he had been wearing his uniform. Other

proof established that it took less than two hours to drive from the Defendant's workplace to Pulaski, where the victim's home was located. The fire was reported at approximately three in the morning.

A flashlight was kept at the security desk where the Defendant worked. This flashlight turned up missing before the fire; the Defendant returned it several days after the fire. The Defendant was observed by a co-worker being told by his father that his mother had died. This co-worker testified that the Defendant showed no reaction to the news. After the Defendant left work, and before he arrived at the funeral home, the Defendant stopped in Franklin and purchased a can of disinfectant. The Defendant's response to being arrested and booked was to question the existence of sufficient evidence to tie him to the crimes.

When initially questioned about the gun he no longer had, the Defendant told police officers that he had purchased it at Golden's Pawn in Lewisburg. Further investigation revealed that there was no such pawn shop in Lewisburg. Rather, the Defendant had purchased the gun from a shop called Pawns Unlimited in Lewisburg.

The Defendant offered explanations to the police as to the gasoline in his car and on his clothes. The jury was entitled to discount these explanations, however. In the light most favorable to the State, the evidence adduced at trial was sufficient to prove beyond a reasonable doubt that the Defendant shot and killed his mother.

The proof is also sufficient to establish that the Defendant's killing of his mother was premeditated and intentional. The victim was found in her bed, dead from a single gunshot wound to her head. There was no evidence of a struggle. The jury was entitled to conclude that the Defendant entered his mother's home sometime between 1:30 and 3:00 a.m. after having driven for over an hour after leaving work. The jury was entitled to conclude that the Defendant had his work flashlight with him, and knew that his mother left her front door open. The jury was further entitled to conclude that the Defendant entered his mother's house in the dead of night, while she was asleep, armed with a gun and equipped with a flashlight so as not to wake her up. He shot her while she lay in her bed, asleep. He then set fire to the premises and, at some point, disposed of the gun. The Defendant's actions smack of a cold-blooded execution followed by efforts to conceal the evidence of his crime. The Defendant's contentions that the evidence is not sufficient to support his conviction of first degree premeditated murder are without merit.

The Defendant also challenges the sufficiency of the evidence supporting his conviction for aggravated arson. That crime is committed when the accused knowingly damages any structure by means of a fire without the consent of all persons who have a possessory, proprietary or security interest therein, and one or more persons are present in the structure. See Tenn. Code Ann. § 39-14-302(a)(1). The Defendant argues that the victim was dead at the time the fire was started, and there was therefore no "person" present in the structure at the time it was set aflame.

This Court has previously rejected this argument. In State v. Richard Darrell Miller, No. 01C01-9703-CC-00087, 1998 WL 601241 (Tenn. Crim. App., Nashville, Sept. 11, 1998), the

defendants killed the victim and then set his home on fire. The victim died before being burned. The victim was still alive, however, while the defendants completed the acts necessary to start the fire. This Court held that the victim's death "while the defendants were in the act of starting the fire, rather than after the explosion," afforded no defense to the charge of aggravated arson. See id., 1998 WL 601242, at *6.

In this case, Dr. Harlan testified that the victim died as a result of the gunshot wound to her head. He also testified that there was no ash or evidence of smoke in the victim's trachea or lungs, and that she had been dead at the time she was burned by the flames. However, Dr. Harlan also testified that the victim could have lived "minutes to hours" after the gunshot wound. Thus, the jury was entitled to conclude that the victim was still alive while the Defendant went about the process of setting the two fires, but died before being burned or inhaling any of the resulting smoke. Under this Court's holding in the Miller case, the Defendant committed arson while a person was present in the structure, and the evidence therefore supports his conviction of aggravated arson. This issue is without merit.

## INEFFECTIVE ASSISTANCE OF COUNSEL

The Defendant contends that his constitutional right to the effective assistance of counsel was violated upon his trial attorney's unilateral decision to prohibit the Defendant from testifying at trial. Given our analysis of this issue in the context of the Defendant's Momon claim, we need not reach the Defendant's concomitant claim of ineffective assistance of counsel. See Momon, 18 S.W.3d at 157 (because the court vacated the defendant's conviction on the basis that he was deprived of his fundamental right to testify, the court "need not reach the Sixth Amendment issue of whether the appellant's counsel was ineffective in failing to advise and consult his client concerning his client's right to testify"). In his brief, the Defendant posits numerous suggestions of action or inaction by his trial attorney which additionally support his claim of ineffective assistance of counsel. Because we have determined that the Defendant's conviction must be reversed due to the Momon error, we see no need to address the additional issue of ineffective assistance of counsel. If our decision vacating the Defendant's conviction is overturned, issues relating to ineffective assistance of counsel may be pursued in post-conviction proceedings.

## CONCLUSION

The Defendant in this case was deprived of his fundamental constitutional right to testify at his trial. The State failed to carry its burden of proving that this deprivation was harmless beyond a reasonable doubt. Accordingly, we must vacate the Defendant's convictions and remand this cause for a new trial.

_____
DAVID H. WELLES, JUDGE