# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 6, 2013

## STATE OF TENNESSEE v. ANDRE HARRIS

**Appeal from the Criminal Court for Shelby County**
**No. 08-07757      Lee V. Coffee, Judge**

---

**No. W2011-02440-CCA-R3-CD  - Filed June 5, 2013**

---

A Shelby County jury convicted appellant, Andre Harris, of first degree murder in the perpetration of a theft, first degree premeditated murder, and theft of property valued under $500.  The trial court merged the murder convictions.  Appellant was sentenced to life for first degree murder and to eleven months, twenty-nine days for theft, to be served concurrently in the Tennessee Department of Correction.  On appeal, appellant submits the following issues for review: (1) whether the trial court erred by admitting a video taped portion of appellant's interrogation from "The First 48"; (2) whether the trial court erred by admitting autopsy photographs; and (3) whether the evidence was sufficient to support appellant's convictions for premeditated murder and murder in the perpetration of theft.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Stephen C. Bush, District Public Defender; and Harry E. Sayle, III (on appeal), Michael Johnson (at trial), and R. Trent Hall (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Andre Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Steve Jones and Nicole Germain, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case concerns the April 2008 homicide of Ronald Paige in Memphis, Tennessee. The Shelby County grand jury indicted appellant for first degree murder in the perpetration of a theft, first degree premeditated murder, and theft of property. The trial court conducted appellant's trial from August 29 through September 2, 2011.

At trial, Carry Morris Paige, the victim's wife, testified that she had been married to the victim for thirty years. He had pastored a church in Earle, Arkansas, from the 1970s until his death. She described him as a person who always tried to help others. At the time of his death, he had an apartment on North Advantage Way in Memphis, Tennessee. Mrs. Paige did not live at the apartment because she was caring for her elderly mother. She visited the victim frequently, however. Mrs. Paige testified that the victim was diabetic and had poor eyesight. She said that in April 2008, he was "very weak," and she explained that he would become short of breath after "walking . . . from the door to the car." She also said that he was no longer able to move furniture.

Mrs. Paige testified that she last spoke with her husband by telephone one week prior to discovering his death. She called him because her car would not start, and he told her that he was unable to speak with her because the maintenance person was at his apartment. When the victim did not come to the Wednesday church service that he usually led, Mrs. Paige went to his apartment. She knocked, but no one answered. She left a note on the door. She returned to the apartment after the victim did not come to church the following Sunday. Again, no one answered when she knocked, and the apartment's management would not let her inside. She called the police precinct the following day. By the time she arrived at the apartment after calling the police, the police were there, and she was not able to go inside.

Mike Brandon testified that he was the maintenance supervisor at the victim's apartment complex. On April 14, 2008, he went to the victim's apartment because he had reported a leak. The victim was present while Mr. Brandon repaired the leak, which was in the kitchen. Mr. Brandon did not see anyone else in the apartment, but he did not go into the bedroom. On April 22, 2008, the apartment's manager told him that the victim's family had asked them to check on him. Mr. Brandon knocked on the victim's door. When no one answered, he used his pass key to open the door. He was able to smell the victim's body immediately, and he saw the body after having opened the door approximately two feet. Mr. Brandon said that he closed the door, re-locked it, and told the manager to call the authorities. Mr. Brandon opened the door for the paramedics when they arrived, and he gave a statement to the police detectives.

Memphis Police Officer Bryant Brooks testified that he was the first officer to arrive at the victim's apartment on April 22, 2008. He and his partner secured the scene. Officer Brooks testified that his partner and two paramedics went inside to determine whether the victim was deceased and whether any other victims were in the apartment. Officer Brooks said that the police learned that the victim's blue Mercedes was missing. They determined that the car had not been towed or repossessed, so they issued an alert for other officers to look for the car.

Memphis Police Sergeant Connie Justice testified that she was the case coordinator for the investigation of the victim's death. She and Sergeant W.D. Merritt went to the crime scene on April 22, 2008. She testified that she observed the victim's body lying on the living room floor five to six feet from the door. The victim's body was in a state of decomposition, and there were blood spatters on some items in the room. Sergeant Justice stated that the blood spatter evidence revealed where the bleeding began and the movement of the person bleeding. In her opinion, the victim began bleeding on the bed, as shown by the large pool of blood on the comforter, and he moved from the bed, went through the bedroom door and a short hallway, and stopped where he was found on the floor in the living room. Sergeant Justice narrated as the State displayed a sketch of the apartment layout and photographs of the crime scene. She testified that the police found a kitchen knife inside a glass decanter located on a piece of furniture in the hallway. The photograph of the knife showed that the blade was bent. The crime scene photographs included pictures of the victim's body as he was found on April 22, 2008. He was wearing a shirt and underwear but not pants. Sergeant Justice testified that there were pieces of a broken crystal decanter next to his body.

Memphis Police Sergeant Anthony Mullins was accepted by the trial court as an expert in blood stain pattern analysis. He testified that he had studied photographs of the blood stains found at the crime scene. The blood stain on the bed indicated to him that the victim was stationary on the bed "for a period of time." There were cast-off blood stains on the wall next to the bed that indicated appellant was standing next to the bed or had one leg on the floor and one on the bed. He explained that a cast-off blood stain is created when the blood on an object, which in this case was a knife, continues moving toward the wall after the object has changed direction. He opined that the victim was stabbed at least three times while lying on the bed based on the number of cast-off stains. Sergeant Mullins testified that transfer stains, where the victim touched or brushed against an object, and drip stains, which came from either multiple bleeding wounds or one large bleeding wound, indicated that the victim was upright as he moved through the apartment. The blood stains did not indicate that the victim was crawling or being dragged.

Sergeant Mullins testified that there were medium velocity impact stains on the wall near the victim's head, as he was found by the police. He explained that impact stains are

created when a person is struck and blood is expelled from their body. The velocity of the spatter depends on the "force . . . applied to the person." For comparison, Sergeant Mullins said that a gunshot wound creates high velocity impact spatter while blunt force trauma creates low to medium velocity impact spatter. The impact spatter on the wall near the victim's head indicated to Sergeant Mullins that the victim was struck while he was lying in the same position in which he was found. He opined that if the victim had been grabbing at someone's leg when that person struck him in the head, there would have been an area on the wall without blood spatter, called a "void," because the spatter would have hit that person's leg instead of the wall. He noted that there was no void on the wall.

Sergeant Justice testified that the police collected items of evidence from the crime scene including a Gatorade bottle, a sugar bowl, a DVD, bedding, and a pair of pants that had a large waist size. The police lifted fingerprints from some of the evidence, which they sent to the crime laboratory.

Nathan Gathright, an employee of the Memphis Police Department was accepted by the court as an expert in latent fingerprint examination and testified that the fingerprints in the apartment matched two known individuals: the victim and appellant. He further testified that he compared the lifted fingerprints to fingerprints taken from the victim's body. He entered the fingerprints that did not match the victim's into the Automated Fingerprint Identification System, which returned a match to appellant's fingerprints.

Sergeant Justice testified that once the police learned that the fingerprints found at the crime scene matched those of appellant, a team went out to locate him. The police officers who located and arrested appellant testified that appellant was at a gas station on Shelby Drive in the driver's seat of a Chevrolet Blazer. The officers took appellant into custody and transported him to the jail in a patrol car. An EBT card with the victim's name was found in the back floorboard of the patrol car after appellant exited, but the card was lost and never recovered.

Memphis Police Sergeant Mundy Quinn testified that he interviewed appellant. He estimated that appellant was approximately six feet, one inch tall, or "maybe a little taller," and weighed between 215 and 220 pounds. Appellant had a muscular build. Sergeant Quinn testified that appellant initially denied knowing the victim and said that he had never been to Raleigh, the neighborhood where the victim's apartment was located. According to Sergeant Quinn, appellant was calm at that point. When Sergeant Quinn informed appellant that his fingerprints had been found in the victim's apartment, appellant became nervous and changed his story.

In his statement to Sergeant Quinn, appellant admitted that he killed the victim. He said that he met the victim at a Citgo gas station on James Avenue during the afternoon of Sunday, April 13, 2008. The victim was passing out flyers about rooming houses. Appellant recalled that the victim was driving a "blue Mercedes Benz." Appellant told the victim he did not have a place to live and was interested in the rooming houses. The victim told appellant that he knew someone who rented rooms for $100 per week. The victim also told appellant that he could stay with him until the rental was "situated." Appellant told Sergeant Quinn that he asked the victim "if he was gay." The victim said that he was not and that he helped "people like this all the time." Appellant went with the victim back to his apartment. They talked about the rooming house and about finding a job for appellant. The victim made some telephone calls, took a shower, and left the apartment.

According to appellant's statement to Sergeant Quinn, the victim returned the following morning. Appellant recalled hearing the victim and another person enter the apartment between 10:30 a.m. and 11:00 a.m., and the other person subsequently left. The victim came into the room where appellant was lying on the bed. Appellant told Sergeant Quinn that the victim put his hands around appellant's neck and tried to "pull out his [own] penis" at the same time while "[the victim] was wrestling and tussling." Appellant said that he picked up a knife from the bedside table but dropped it and cut himself. He picked up the knife from the floor, turned, and stabbed the victim in the neck. Appellant said that "[i]t didn't work" and that the victim continued trying "to put [him] in a choke hold." According to appellant, they rolled off the bed and stood up, still "tussling." The victim tried to take the knife and pushed appellant. Appellant ran out of the room but tripped and fell. The victim followed him while also "trying to pull up his pants." The victim fell, also, but he crawled after appellant and grabbed appellant's leg. Appellant said they reached the living room, and appellant grabbed a bottle and "hit him on the back of the head." The victim "stopped moving."

Appellant told Sergeant Quinn that "five or ten minutes later" he changed shirts and put on pants and shoes. He wiped off the blood in the bathroom. Appellant said that he took the victim's car keys and a money clip containing an EBT card and $23 from the apartment, then left and sat in the victim's car for several minutes, debating whether to call the police. Appellant drove to Forrest City, Arkansas, and stopped at a Walmart. He walked from Walmart to a Greyhound bus station, bought a ticket, and returned to Memphis by bus. Upon further questioning by Sergeant Quinn, appellant said that he stabbed the victim "at least fifteen times . . . [i]n the neck area." He struck the victim twice with the bottle, and the bottle shattered.

On cross-examination, Sergeant Quinn testified that he remembered appellant's being nervous when he came into the interview. When asked whether he had seen the episode of

the television documentary "The First 48" that showed appellant's interview, he responded affirmatively. He did not recall needing to take a break from the interview due to appellant's becoming "very emotional," but he did recall that appellant got "upset briefly." During re-direct examination, the State played a video taped recording of a portion of Sergeant Quinn's interview of appellant that had been filmed and edited by "The First 48."

Jeffrey Guide testified that in April 2008, he was the asset protection coordinator at the Walmart in Forrest City, Arkansas. He recalled that the Memphis Police Department homicide bureau contacted his store about a dark-colored Mercedes 500. Mr. Guide located the Mercedes in the store's parking lot and notified the police. He reviewed the store's video surveillance and determined that the vehicle arrived in the parking lot on April 14, 2008. Using the store's video recordings, he followed the person who exited the vehicle through the store. A camera positioned at the store's front door had captured the person's face, and Mr. Guide testified that the person was appellant. Appellant entered the store, went to the electronics department, and attempted to make a purchase. The credit card he tried to use was declined. He returned to the Mercedes, stayed in the car for a moment, and then came back to the store. Appellant attempted to make a purchase at the same register, but the card he used was likewise declined.

Sergeant William Merritt testified that he drove to the Forrest City, Arkansas Walmart and confirmed that the victim's Mercedes was parked in its parking lot. He determined that the distance from the victim's apartment to the Forrest City Walmart was 55.2 miles. He obtained a DVD of the store's video surveillance and print-outs of appellant's attempted purchases. Sergeant Merritt testified that appellant tried to purchase a cellular telephone. He said that appellant walked to a bus station after leaving Walmart and purchased a one-way ticket back to Memphis. He further testified that appellant's driver's license application from April 9, 2008, listed his height as six-feet, one-inch, and his weight as 210 pounds, which was consistent with Sergeant Merritt's observation of appellant. The application listed appellant's address as a residence on Castle Drive.

Dr. Lisa Funte, a medical examiner at the Shelby County Regional Medical Center, testified that she performed an autopsy on the victim on April 23, 2008. She said that the victim "came from the scene in a state of moderate decomposition." The victim had "sharp force injuries" and "blunt force trauma." According to Dr. Funte, only one sharp force injury involved a "vital structure," which was the victim's jugular vein. She testified that an injury to the jugular vein can result in death from blood loss unless a person has prompt emergency medical intervention. The victim had sharp force injuries on his face, neck, shoulders, scalp, chest, abdomen, back, hands, and wrists. Dr. Funte said that "[t]he maximum depth of penetration [of the stab wounds] was five and an eighth inches." She opined that the other stab wounds did not penetrate any vital organ because the victim was "morbidly obese[,] and

-6-

a lot of these [stab wounds] did penetrate just into the subcutaneous fat." Dr. Funte classified the hand and wrist injuries as defensive wounds. The victim had sixty-six stab wounds and twenty-five incised wounds. She testified that he also received blunt force injuries to his skull that would have been fatal. He had "multiple skull fractures, some of which were depressed, which means that the bone moves inward . . . toward the brain." The injuries resulted in a cranial hemorrhage. Dr. Funte testified that the victim received "at least eighteen strikes to the head." She further testified that at the time of his autopsy, the victim was five feet, six inches tall and weighed 251 pounds. She said that the height measurement was taken while the victim's body was lying on a table and might be "[l]ess than an inch" different than his height when standing upright. The weight measurement was affected by the decomposition of the body, so the victim would have weighed more when alive. Dr. Funte testified that the victim's cause of death was "homicidal violence," and she said that she used that terminology because there were multiple lethal injuries, one caused by sharp force and several by blunt force. She said that she was not able to determine the exact chronology of when the victim received the injuries. She also stated that the stab wound to the jugular vein would not have immediately affected the victim's mobility but that the blunt force injuries were more likely to be immediately incapacitating.

Appellant testified on his own behalf. He said that in April 2008, he was homeless. He met the victim at a gas station on April 13 and began talking to him because the victim was passing out flyers for rooming houses. Appellant said that the victim offered to let him stay at his apartment until "he could get [appellant] situated with the rooming houses." They drove to the victim's apartment and went inside. They talked in the living room, and then appellant watched movies in the victim's bedroom. The victim left and did not return until the following morning. In the meantime, appellant drank liquor and ate a microwave meal. He fell asleep at approximately 11:00 p.m.

Appellant testified that the next morning, he heard the victim and another person come inside the apartment. He fell asleep again. Appellant testified that he woke up when the victim started choking him. He said that he thought he "was going to pass out." The victim "let up" and "started reaching for his [own] pants." Appellant testified that the victim "was trying to pull out his [own] penis[,] and he was trying to pull down [sic] [appellant's] penis[,] too." Appellant said that he grabbed a knife from the dresser and started stabbing the victim while they wrestled on the bed. He further said that he tried to run away after they "hit the floor," but the victim was "constantly grabbing" him. They both stood up and continued "tussling" as they were leaving the room. Appellant could not remember whether he was still "swinging at him with the knife." He said that they both fell to the floor again, and the victim "took off his pants and set them on top of me." Appellant testified that they struggled as they went down the hall and into the living room. When they reached the living room, appellant grabbed a bottle and hit the victim in the head.

-7-

Appellant testified that he grabbed the bottle because "[t]he knife was so small" that he did not "think it was doing anything." He said that he did not "intend to stab him that many times." He testified that they were "both in a rage" and that the victim was fighting him the entire time. He said that he "was scared for [his] life." He acknowledged that the victim stopped moving when he hit him in the head with the bottle and that he continued hitting him even though he was no longer defending himself. Appellant said that he stopped attacking the victim when the bottle broke.

Appellant testified that after the bottle broke, he sat on the floor for five to ten minutes contemplating whether to call the police. He decided not to call the police. Instead, he washed his hands and changed clothes, and then he took the keys to the Mercedes and drove to Arkansas. He said that he did not take anything else from the apartment besides the keys and that the money clip and EBT card were already in the car. Appellant testified that he sat in the Walmart parking lot for awhile, crying and thinking about turning himself in to the police. He found gift cards in the trunk of the car and tried to use them to buy a cellular phone and "an air time card," but there was not enough money on the cards. Appellant said that he did not want to drive the Mercedes back to Memphis because he was concerned about wrecking. He learned that there was a bus station nearby, so he went to the station and bought a ticket back to Memphis. He returned to Memphis and stayed in the city until his arrest. He said that he thought about turning himself in and that he knew he would eventually be arrested. Appellant admitted that he had been arrested previously for misdemeanor thefts and passing bad checks.

Following the close of proof and deliberations, the jury convicted appellant of first degree murder in the perpetration of a theft, first degree premeditated murder, and theft of property valued under $500. The first degree murder convictions merged by operation of law. The trial court sentenced appellant to a life sentence for the first degree murder conviction and to a concurrent sentence of eleven months, twenty-nine days for the theft conviction, to be served in the Tennessee Department of Correction. This appeal follows.

## II. Analysis

### A. Admission of "The First 48" Video

Appellant argues that the trial court erred by admitting a segment of the television documentary "The First 48" that showed appellant's interview by Sergeant Quinn and his partner. As grounds, he claims that the trial court failed to comply with the procedural requirements of Tennessee Rule of Evidence 404(b) and that the trial court improperly ruled that appellant had opened the door to having the video admitted. The State responds that appellant opened the door for the admission of the evidence by mentioning during the cross-

examination of Sergeant Quinn that an edited version of appellant's interview appeared on "The First 48."

The record shows that during Sergeant Quinn's direct examination, he testified that appellant was calm during his interview. On cross-examination, he clarified that appellant "was nervous when he came in" to the homicide bureau's office. Immediately after Sergeant Quinn's clarification, appellant's counsel stated, "As a matter of fact . . . there was an edited version of this on The First 48." He then asked Sergeant Quinn several questions about what was said by the police and by the appellant and appellant's reactions and emotions during the interview. Upon the conclusion of cross-examination, the State requested a bench conference. The State asked that it be allowed to introduce a portion of "The First 48" episode, despite the parties' agreement not to mention the episode during the trial, because otherwise the jury would know that there was a video-recording of appellant's interview that the State had not introduced. The State admitted that it told the jury venire that "The First 48" had covered the appellant's case and that it asked whether any members of the venire watched the show. The State maintained that it had not referenced exactly what had been recorded. Appellant responded that he had not opened the door to the admission of the video and would not have broached the subject but for the State's reference during voir dire. The trial court held a jury-out hearing to allow the State to proffer the segment showing appellant's interview. During the jury-out hearing, appellant protested that the video included improper references to a "stolen Blazer." Appellant did not request a hearing under Tennessee Rule of Evidence 404(b).

The trial court ruled that the video from "The First 48" was admissible to rebut the inferences raised during the cross-examination of Sergeant Quinn. The court stated that "the questions that were asked by [appellant's counsel] represent[ed] some of what happened in the interview room, but it [was] not a fair representation of what happened in the interview room." The court further stated that appellant's cross-examination of Sergeant Quinn "would leave an impression that there [was] something that was recorded that would indicate that Sergeant Quinn's testimony may or may not be accurate." The court found that under Tennessee Rule of Evidence 106, also known as the rule of completeness, a portion of appellant's interview had been introduced so the video of the interview as shown on "The

First 48" should be introduced.[1]  After the State played the video, the trial court gave this instruction to the jury:

> The tape that you just viewed is not being offered for [the] truth of those matters asserted, and that tape is being shown to rebut any inferences that [appellant] was nervous and emotional when he first came into the homicide office and to show his demeanor during this interview[,] and you can consider that tape for those purposes and only for those purposes.

Appellant contends on appeal that the trial court erred by admitting "The First 48" video into evidence.  The determination of whether evidence is admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion.  *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996).  "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application.  Tenn. R. Evid. 402.

Appellant first argues that the trial court failed to follow the proper procedure under Tennessee Rule of Evidence 404(b) because it did not hold a jury-out hearing on the evidence of other crimes, namely the mentioning of a stolen Blazer during appellant's interview.  Rule 404(b) provides:

> Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

---

[1]  Tennessee Rule of Evidence 106 states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  This rule is more typically invoked when one party introduces a portion of a statement and the opposing party introduces the remainder of the statement. *State v. Vaughn*, 144 S.W.3d 391, 408 (Tenn. Crim. App. 2003).  However, this court has also determined that a cross-examination can be so detailed as to be an effective introduction of the statement. *State v. Belser,* 945 S.W.2d 776, 788 (Tenn. Crim. App. 1996).  In any event, the parties in this case have not presented their arguments on appeal based on Rule 106; therefore, whether the trial court correctly applied the rule is not at issue.

-10-

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

In this case, the trial court did not comply with the procedural requirements of Rule 404(b). Appellant objected to allowing the jury to hear that he had been accused of stealing a Blazer. However, appellant failed to specify that he objected to the introduction of the video under Rule 404(b) and failed to request a 404(b) hearing. Appellant also failed to request that the trial court "state on the record the material issue, the ruling, and the reasons for admitting the evidence." Tenn. R. Evid. 404(b). Thus, appellant has waived any argument that the trial court erred by not holding a 404(b) jury-out hearing. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Because it was irrelevant, the trial court should have redacted the mention of the stolen Blazer from the video shown to the jury, but its failure to do so was harmless error under Tennessee Rule of Appellate Procedure 36(b) in light of the record as a whole. Appellate admitted to killing the victim and taking the Mercedes. In his testimony, appellant also admitted that he had prior convictions, including misdemeanor theft. Thus, the mention of the stolen Blazer was prejudicial to appellant but not significantly so. Moreover, the trial court instructed the jury that the video was not offered for the truth of any matters asserted. Based on the record before us, we cannot say that any error in admitting the stolen Blazer portion of "The First 48" video "more probably than not affected the judgment." Tenn. R. App. P. 36(b). Appellant is not entitled to relief on this issue.

Appellant also argues that the trial court erred by finding that appellant opened the door to the admission of "The First 48" video. Our supreme court recently described the concept of "opening the door" as "an equitable principle that permits a party to respond to

-11-

an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). In this case, the record reflects that the parties agreed prior to trial not to introduce "The First 48" video as evidence due to the fact that the video was produced for television and had been heavily edited by the production company. However, appellant interjected the issue of "The First 48" video during his cross-examination of Sergeant Quinn. Until that point, the jury did not know that a video-recording of appellant's interview existed. The trial court found that appellant's cross-examination of Sergeant Quinn created a false impression of appellant's interview and opened the door to the State introducing the video during its redirect examination. We conclude that the trial court did not abuse its discretion in admitting the evidence. Appellant is not entitled to relief on this issue.

## B. Autopsy Photographs

Appellant argues on appeal that the trial court erred by admitting into evidence twenty photographs of the victim's autopsy. He contends that the probative value of the photographs is substantially outweighed by the danger of unfair prejudice because the number and location of the victim's wounds was not contested and the victim's body was in a state of decomposition at the time of the photographs. Tenn. R. Evid. 403. The State responds that the trial court did not abuse its discretion because the photographs were not particularly gruesome; they were necessary to prove premeditation; and they were highly probative of what actually happened between appellant and the victim. We agree with the State.

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949. Next, a trial court must determine whether the photograph is relevant. *Id.*; s*ee* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Tenn. R. Evid. 403, Adv. Comm'n Note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its
> value as evidence; whether the picture depicts the body as it was found; the

adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant"and must be relevant to prove some material aspect of the case. *Id.* at 951. "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)), *perm. app. denied* (Tenn. Dec. 14, 2011).

In this case, the photographs were highly probative of issues presented at trial and were not particularly gruesome; thus, the trial court did not abuse its discretion in admitting them into evidence. Appellant claimed before and during trial that he did not remember stabbing and bludgeoning the victim as many times as the physical evidence showed. Nor did he recall stabbing the victim in any place other than his neck. The photographs pointedly contradicted appellant's statements. Therefore, the photographs were highly probative of the actual number and location of the wounds. Moreover, the State was required to prove the element of premeditation. Among the factors probative of premeditation are "the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, [and] infliction of multiple wounds." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). The autopsy photographs were probative of these circumstantial indicators of premeditation. In sum, the State and appellant presented opposing theories of how appellant killed the victim, and the photographs had significant probative value in helping the jury determine what actually happened in the victim's apartment.

In addition, the prejudicial value of the photographs was not significant. The photographs in question are not particularly gruesome. The victim's body had been cleaned,

and there was no blood.  We note that appellant has not contested the admission of the crime scene photographs, which showed the victim's body with blood and other bodily fluids on it.  We conclude that the autopsy photographs were relevant to several issues presented at trial and that their probative value was not substantially outweighed by the danger of unfair prejudice.  Therefore, the trial court did not abuse its discretion in admitting the photographs, and appellant is without relief as to this issue.

## C.  Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to support his convictions for premeditated murder and murder in the perpetration of a theft.  He argues that the evidence was only sufficient to warrant a conviction for voluntary manslaughter.  Appellant does not contest the sufficiency of the evidence supporting his conviction for theft.

### 1.  Standard of Review

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom."  *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence.  *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*,

676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

2. Premeditated Murder

The jury convicted appellant of premeditated murder. Tennessee Code Annotated section 39-13-202(a) (2010) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense," thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

Viewed in the light most favorable to the State, the evidence was sufficient to show the necessary premeditation and intent to support appellant's conviction for premeditated

murder. Appellant contends that the "overwhelming weight of the evidence" shows that appellant killed the victim with adequate provocation after the victim's sexual attack. We disagree.

The evidence presented at trial showed that the victim was in poor health. He could not walk far without becoming short of breath and could not move furniture. In addition, he was unarmed when the killing occurred. On the other hand, appellant was a tall, muscular young man, and he used two separate weapons to kill the victim. The State's witnesses testified that the altercation between appellant and the victim began in the bedroom, and the amount of blood on the bed indicated that the victim was stationary there for some time. None of this evidence supports appellant's contention that the victim initiated an attack against him. Furthermore, Sergeant Mullins testified that based on the blood spatter evidence, the victim was upright as he moved away from the bedroom into the living room, which is contrary to appellant's assertion that the victim crawled on the floor and grabbed at him. The blood spatter also showed that appellant was standing beside the bed when he stabbed the victim and that he was standing behind the victim as he bludgeoned the victim's head with the decanter.

The medical examiner testified that the victim had sixty-six stab wounds, twenty-five incised wounds, and at least eighteen blunt force injuries. She further testified that the cutting of the victim's jugular vein would not have been fatal if the victim had received immediate medical attention, but the trauma to the victim's head was fatal. In other words, if appellant had stopped stabbing the victim after hitting his jugular vein and sought medical help for the victim, the victim might have lived. Instead, appellant kept stabbing him before hitting him in the head with a decanter until the decanter broke, even though the victim was lying prostrate on the floor by that time. The evidence of the sheer brutality of the killing was more than sufficient evidence for the jury to find appellant guilty of premeditated murder.

### 3. Murder in the Perpetration of a Theft

The jury also convicted appellant of murder in the perpetration of a theft. Tennessee Code Annotated section 39-13-202(a)(2) defines this category of first degree murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft . . . ." Tennessee Code Annotated section 39-14-103 defines theft: "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Our supreme court has ruled that the theft does not have to precede the killing, "so long as there is a connection in time, place, and continuity of action," but the intent to commit a theft "must exist prior to or concurrent with the commission of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 106-07 (Tenn. 1999). The proof of a defendant's intention "is a question

of fact to be decided by the jury after consideration of all the facts and circumstances." *Id.* at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* at 108.

Viewed in the light most favorable to the State, the evidence was sufficient to support appellant's conviction for murder in the perpetration of a theft. Appellant testified that he was homeless when he met the victim. When he spoke with Sergeant Quinn, appellant specifically recalled that the victim was driving a Mercedes Benz, which is commonly considered a luxury vehicle. After he killed the victim, he took the victim's keys and money clip, which held both an EBT card and $23. While he testified at trial that he found the money clip in the victim's car, his statement to Sergeant Quinn indicated that he took the money clip from the victim's apartment. Appellant stole the victim's car, drove it to another state, and used the cash taken from the victim to buy a bus ticket back to Memphis. There is clearly a connection in time, place, and continuity of action between the killing of the victim and the taking of his property. The jury could reasonably infer that appellant killed the victim in the perpetration of the theft; therefore, the appellant's argument is without merit.

## CONCLUSION

Based on our review of the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE