# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 23, 2019 Session

## STATE OF TENNESSEE v. DIONTAE SMARTT

**Appeal from the Criminal Court for Hamilton County**
**No. 294713   Don W. Poole, Judge**

_____

### No. E2018-02013-CCA-R3-CD

_____

A Hamilton County jury found Defendant, Diontae Smartt, guilty of aggravated sexual battery, for which he received a sentence of eight years' incarceration.  On appeal, Defendant contends that the trial court erred by denying his motion to admit the video recording of his statement to police in its entirety, pursuant to Tennessee Rule of Evidence 106, after the State questioned Defendant about inconsistencies between the statement and Defendant's trial testimony.  Defendant further contends that the trial court erred by denying his request to instruct the jury on self-defense as the defense was fairly raised by the proof at trial.  Following a thorough review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Steve E. Smith, District Public Defender; and Erinn Rene O'Leary and Christian Coder, Assistant District Public Defenders, for the appellant, Diontae Smartt.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Neal Pinkston, District Attorney General; and Jason Demastus and AnCharlene Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

In March 2015, the Hamilton County Grand Jury indicted Defendant for aggravated rape.[1]  The indictment alleged that Defendant:

> on September 29, 2014, in the County aforesaid, did unlawfully and intentionally or knowingly engage in sexual penetration of [the victim] and . . . [D]efendant caused bodily injury to the victim, in violation of Tennessee Code Annotated [section] 39-13-502[.]

*Trial Testimony*

Defendant's case was first tried in August 2017; however, the trial court declared a mistrial after the jury could not reach a unanimous verdict on the charged offense.  The case proceeded to trial for a second time in April 2018.  The victim's daughter testified that on the morning of September 29, 2014, the victim called her around 7:00 a.m.  The victim sounded "[s]haken and upset" and said that he needed to go to the emergency room because he had been raped.  The victim's daughter drove to the victim's residence, which was about two or three minutes from her home.  When she arrived, she saw that the victim had been "beaten up."  She testified that she tried to hug the victim, but he was "very standoffish" and did not want to be touched.  She took the victim to the emergency room at Parkridge Medical Center ("Parkridge").  She testified that they arrived around 7:30 a.m. and did not leave until 12:30 or 1:00 p.m.  The victim's daughter stated that the victim's injuries required immediate medical attention but agreed that neither she nor the victim called 911.  She stated that she later learned that Defendant's residence was "four doors down" from the victim's home.

The victim's son testified that he received a call from his sister on the morning of September 29, 2014, informing him that the victim had been raped.  The victim's son explained that he worked as a dispatch operator for Hamilton County 911 and that, after learning about the offense, he called dispatch and spoke to his supervisor.  He told his supervisor that the victim had been raped and was being taken to Parkridge.  The victim's son then went to the hospital where he saw the victim.  The victim's demeanor was unusual as he seemed "glum" and "sad."

---

[1] Defendant's case originated in Hamilton County Juvenile Court but was transferred to Hamilton County Criminal Court.

Delight Chandler testified that she was working as a nurse in the emergency room at Parkridge on the morning of September 29, 2014. Ms. Chandler recalled that the victim came in and stated that he had been sexually assaulted. Ms. Chandler took the victim back to a private room, noting that he had an abrasion on his head. The victim described "some pain to the ribs." Ms. Chandler testified that she notified the police department and the Partnership Rape Crisis Center ("Rape Crisis Center"), as per hospital policy. Ms. Chandler testified that the victim's son had already reported the offense to the Chattanooga Police Department.

Rebecca Ammons testified that she was a nurse practitioner employed at the Rape Crisis Center as a sexual assault nurse examiner. On September 29, 2014, she interviewed and examined the victim at Parkridge. The victim reported that the sexual assault occurred between 6:30 a.m. and 6:45 a.m. He stated that he did not know the perpetrator. He stated that he was "held down by the suspect and that he was injured and beaten[.]" The victim denied having sexual relations with anyone in the seventy-two hours preceding the sexual assault and stated that he had no injuries prior to the sexual assault. Ms. Ammons testified that she noted both non-genital and anal-genital injuries to the victim. The victim stated that he was "penetrated by the [perpetrator's] penis[.]" Ms. Ammons stated that the victim suffered a "long laceration" on his head, and his abdomen had an "abrasion and some tenderness upon palpitation." The victim reported that the entire right side of his abdomen was tender and sore when he moved. The victim had lacerations on his arms and abrasions "from the hips down." The victim also had a large contusion on his left upper arm and a large abrasion on the buttocks. Ms. Ammons testified that she performed a rape kit on the victim, during which she collected anal swabs and buccal swabs from the victim. She explained that the victim had "a large[,] bigger-than-two-centimeter[s], contusion on the anal tissue of the rectum." Ms. Ammons testified that the victim's injuries were consistent with forcible penetration. She photographed the victim's injuries and gave the victim's clothing to police.

Sergeant Joe Montijo with the Chattanooga Police Department testified that on September 29, 2014, he received a call from lead investigator Lucas Fuller. Investigator Fuller advised that he was at Parkridge with an elderly male who had been raped and assaulted. He requested that Sergeant Montijo come to the hospital to document the victim and collect evidence.

Sergeant Montijo testified that he took photographs of the victim, documenting any visible injuries. He recalled that the victim had on a soiled white t-shirt and had injuries to the back of his head. He had a large laceration on the back of his head, a scrape mark on his neck, and both of his elbows were "skinned up." The victim also had abrasions on his back and a "scraped up" abdomen. Sergeant Montijo collected the victim's shirt, jogging shorts, and underwear, as well as the completed rape kit. He also

took swabs of the victim's hands, underneath his fingernails, and a buccal swab. After leaving the hospital, Sergeant Montijo located the crime scene on Mississippi Avenue. He found a red stain on the sidewalk that was consistent with a blood. He stated, "There was quite a bit of blood and skin and debris[.]"

Two days later, when Investigator Fuller brought Defendant to the police department for an interview, Sergeant Montijo photographed Defendant, took fingerprints, and collected a DNA sample. Sergeant Montijo explained that Defendant had visible injuries. He had "very pronounced bruises" on his shoulders; a laceration on his arm; abrasions, bruises, and scrape marks on his knees; an abrasion on his elbow; and a raised abrasion on the bridge of his nose.

Investigator Lucas Fuller testified that he worked as a criminal investigator at the Chattanooga Police Department in September 2014. On September 29th, he responded to Parkridge to interview the victim. After speaking to the victim, Investigator Fuller conducted a neighborhood canvas as Sergeant Montijo collected evidence. Investigator Fuller explained that he received a tip that identified Defendant as a suspect. Investigator Fuller learned that Defendant was a student at Red Bank High School. After locating photographs of Defendant on Facebook, Investigator Fuller noted that Defendant's age, build, and hairstyle matched the victim's description of the perpetrator. Investigator Fuller went to Red Bank High School and obtained video footage from the morning of September 29, 2014, that showed Defendant arrived late to school. Investigator Fuller explained that Defendant's residence was on Federal Street, "less than a half mile" from the crime scene. Investigator Fuller testified that he interviewed Defendant and collected a DNA sample, which Defendant willingly provided. Investigator Fuller recalled that Defendant had scrapes on his knees and scrapes to his back. He stated that Defendant had a "stutter or speech impediment" and that he was crying uncontrollably at times during the police interview.

Special Agent Chad Johnson, a forensic biologist in the DNA unit of the Tennessee Bureau of Investigation, testified that he tested several items of evidence in connection with Defendant's case. He first tested anal swabs taken from the victim's rape kit and found that the victim's "DNA [was] there on the anal swab as part of the sperm fraction, but there [was] a second individual that [was] inconclusive as to [Defendant][.]" Agent Johnson explained that he also found the presence of spermatozoa on the "inside back area" of the victim's underwear. He obtained a partial DNA profile from the sperm fraction, and the partial profile matched Defendant's DNA profile in a percentage "greater than the world population[.]" Agent Johnson further testified that he found a bloodstain on the back side of the victim's underwear; he obtained a DNA profile from the stain and found that it matched Defendant's DNA profile. Agent Johnson stated

that he also obtained a DNA profile from a bloodstain collected at the crime scene on Mississippi Avenue, which matched the victim's DNA profile.

The victim testified that in September 2014, he lived on Federal Street and that he was sixty-nine years old. The victim explained that he ran three miles every morning between 5:00 and 7:00 a.m. He said that his practice at the end of every run was to "walk a little bit to cool down." The victim testified that on the morning of September 29, 2014, he finished his run around 6:30 or 6:45 a.m. and began walking in an area near his home. He stated that, when he turned onto West Mississippi, he saw Defendant walking from Forest Avenue towards East Mississippi. The victim explained that, the next thing he knew, Defendant was "right behind" him. Defendant tried to put his arm around the victim, and the victim pushed it away. The victim testified, "He asked me if I wanted to engage in a homosexual act with him and I told him no." Defendant "kept walking beside [the victim] and asking [him] why not, why don't you want to." The victim responded, "I don't do things like that" and repeatedly told Defendant "no." The victim did not want Defendant to follow him home, so he stopped and confronted Defendant. Defendant then "charged him," knocked the victim to the ground, and began pulling the victim's shorts and underwear down. The victim fell onto his back, and the back of his head landed against the bottom of a set of steps. The victim recalled:

> The first thing I did, I kicked him in the chest, I guess one of my feet, and it knocked him back off of me. And at that time, I tried to pull my shorts back up because they're down around my knees and I can't do much. He was immediately back on me, just like he's energized. And, you know, I'm exhausted, he's energized. So he pulls the pants back down again.

The victim explained that Defendant held him in a position where his shoulders and part of his back were still on the ground but his legs were "lifted up." The victim recalled that his head was pushed up against the step in a position where he could not move much. The victim testified that Defendant "took his penis and pushed it into [the victim's] rectal area." The victim recalled:

> I tried to scream a couple of times, maybe it was three or four, you know. There was nobody around. He kind of looked around to see what was going on. And then the pain from the force was more, I couldn't hardly scream anymore. So, you know, finally, he finished up, he pulled out, and then he said "one more time." So then he forced his penis into my rectal area again the second time. The pain became even more intense and I just, all I could do was beg him to quit and leave. So, finally, he finishes up and he steps back out in the street and, I guess, getting himself together again, and he walks off and says "have a sweet day."

- 5 -

The victim testified that, after the assault, he returned home but began to feel pain in his chest. The victim called his daughter and asked her to take him to the emergency room at Parkridge. The victim recalled that he spoke to Investigator Fuller the next day. The victim testified that he had never seen Defendant before that morning but agreed that he could see Defendant's front door from the deck of his home.

Defendant testified that he was hit by a car three weeks prior to September 29, 2014, and that he had a sprained ankle that necessitated the use of crutches for several weeks. He stated that he stopped using the crutches a day or two before the offense. Defendant testified that he lived on Federal Street and that he was walking to his bus stop at the corner of Liberty and Mississippi Avenue on the morning of September 29. He stated that he left his residence around 6:10 a.m. because his bus arrived at 6:20 a.m. Defendant said that he saw the victim run past him, and he said "hi" to the victim but kept walking towards the bus stop. Defendant claimed that the victim "circled back around[,]" put his arms around Defendant, and asked Defendant to have sex with him for $100. Defendant testified that he told the victim "no" and that he "wasn't into that."

Defendant stated that he was walking down the road "side-by-side" with the victim when the victim pulled him into a "dark little area[.]" He stated that the victim pulled his own pants down and that Defendant was on his knees during the encounter. Defendant testified, "[The victim] undid my pants when his was down already, and that's when . . . he had me to penetrate him[.]" Defendant also stated that he did not use any lubricant before he penetrated the victim.

Defendant testified that he hit the victim when the victim grabbed his testicles. He recalled that he and the victim engaged in a "[s]cuffle." Defendant claimed that he was attempting to "pull away" from the victim but that the victim was holding Defendant's testicles. Defendant explained that he dragged the victim down the stairs until the victim let go. Defendant then put his clothes back on and asked the victim for money, but the victim told Defendant that he was not giving him money.

Defendant testified that he went to a neighbor's house and asked her to take him to school because he had missed the bus. Defendant said that he waited about thirty or forty minutes before his neighbor could take him to school and that, consequently, he was late to school that morning. Defendant testified that he was at school the next day when the school resource officer pulled him out of class. Defendant was taken to the police station, and he was interviewed by police after his parents arrived. Defendant explained that he felt hurt and ashamed and was crying during the entire interview. He testified that he was "really emotional, sad, [and] hurt." Defendant said that he was unable to tell the "whole story" because he was emotional and officers "kept walking in and out and asking [him] questions . . . interrupting [Defendant] the whole time."

On cross-examination, Defendant admitted that he first lied to the officers about the incident, denying that he had any contact with the victim. He said that he changed his story after learning that the victim accused him of rape because he was "not fixing to go down for something [he] didn't do." Defendant told Investigator Fuller that he had consensual sex with the victim. Defendant also told Investigator Fuller that he punched the victim before he penetrated him.

*Introduction of Defendant's Recorded Statement*

During cross-examination, the State questioned Defendant regarding inconsistencies in his statement to Investigator Fuller, as follows:

> [THE STATE:]    You were asked if you knew who this individual was, weren't you?
>
> [DEFENDANT:]    Yes.
>
> [THE STATE:]    You told them you didn't know?
>
> [DEFENDANT:]    Yes.
>
> [THE STATE:]    You told them you knew there was a rape in the area, but you didn't have anything to do with it . . . ?

At this point, defense counsel objected and argued, "At this point, I think under . . . Rule 106, the defense, because the district attorney is entering elements of his prior statement, the defense has the absolute right to request that the entire statement be played for the jury." Initially, the trial court ruled that the State could cross-examine Defendant on his prior statements and then it would allow defense counsel to introduce the recording of "the complete statement[.]" The State continued its cross-examination of Defendant, questioning him about inconsistencies between his testimony on direct examination and his statement to Investigator Fuller, using a transcript of the recorded statement to assist in cross-examination. During a jury-out hearing, the State argued that Rule 106 did not require that Defendant's entire statement to be played but only what was necessary to provide context. Defense counsel responded that, under the rule, "if any portion of [Defendant's statement] comes in, the entire thing comes in."

The trial court then took an hour recess to review Defendant's statement to Investigator Fuller and case law presented by defense counsel. Following the recess, the trial court ruled, as follows:

And here's what the Court's ruling. And the whole rule is based upon being fair and to put the statement in context. I think to put the statement in context, most of the questions concern themselves with him not telling the truth. I think [Defendant] gives an adequate explanation on the stand, and starting in this statement, of why he didn't tell the truth; one, his mom was in the room, he was embarrassed, he didn't want to tell what happened.

It seems to me, in looking at the statement, that the first [twenty-five] pages of that statement, to put it in context, [Defendant's] in the police department, he's being talked to by the police detective, he's being advised of his rights, he initially says it didn't happen. When his -- and then when his mom leaves, he cries, I think his emotions are important, I think that puts it in context. His mom leaves and then he completely tells what happened. And that's basically what he's testified to today.

The Court rules that to put this in context, to be fair, the first [twenty-five] pages will be played. I want the jury to see him crying, his emotions, I think that's important, to be fair. And I think it's important, to be fair, to say that when his mom left the room, he gave the statement that he basically has given today.

. . . [The State] is going to play down to the first [twenty-five] pages of that statement, that explains the clothing, that explains the cooperation, then that explains later when his mom says he wouldn't do something like this. She leaves the room, he then says I haven't been telling you the truth, it was consensual. He's testified to that today. I don't think we have to play the whole statement to get in context and to be fair what really happened.

When the State resumed its cross-examination of Defendant, it played the first thirty-six minutes and twenty-five seconds of Defendant's recorded statement for the jury, which covered the first twenty-five pages of the transcript of Defendant's statement. The State then questioned Defendant regarding prior inconsistent statements he made on the next three pages of the transcript. Specifically, Defendant had testified that he struck the victim with his elbow when the victim propositioned him for sex, but he told police that he had punched the victim in the face. Defendant explained that he understood punching and elbowing to mean the same thing. Defendant testified that the victim did not threaten to accuse him of rape; however, he told Investigator Fuller that the victim threatened to lie to police and accuse him of rape. Additionally, Defendant stated that both he and the victim were on the steps during the offense, but the State confronted

Defendant with his statement from the interview where he said they were on the ground. Defendant explained that his prior statement referred to what happened "after the fact." Finally, Defendant testified that he did not use any lubrication when he penetrated the victim, but he told Investigator Fuller that he used saliva as a lubricant.

Defense counsel again requested that the entire recording of Defendant's statement be admitted, but the trial court stated:

> I tried to put it into context. I did, quite frankly, think that [the State] was through with his questioning, but I really thought the context . . . and the import of what I allowed the jury to hear, was this: [Defendant] subjected himself to police interrogation, advised him of his rights, he gave a statement, initially denying any contact. I think the context that I wanted the jury to hear, and which they did hear, was he said, Look, my mom was here, I haven't told anybody, I'm too embarrassed, I'm too ashamed to tell anybody anything.
>
> That's the context that I thought, quite frankly, was important. To allow another hour of the thing, I don't think has anything to do with the completeness, don't know that that helps anything, quite frankly. I don't know that that adds anything.
>
> [Defendant] has testified for a lengthy period of time as to what he says happened. He told the police initially that all that was not true, but then, based upon shame, embarrassment, his mother present, he then said, Look, officers, I didn't tell you the truth. I think that was the import of allowing the transcript that I allowed. But simply because other questions are asked later about that, I don't know that the Rule of Completeness would require [us] to play the whole thing simply because two or three more questions were asked. Now, I may be wrong. But it seems like to me, in fairness, the jury has heard [the State] ask [Defendant] about prior lying[.] I think the jury, the trier of fact, saw in context why he said what he said to the police. . . . Certainly, we've tried it before, I watched the whole thing, [Defendant] basically says at that time what he's testified to today. And certainly it was emotional, you know.
>
> And I'm trying to explain my ruling, and I'm trying, once again, to put it in context and to be fair. But I think, in context, the jury heard why he said what he said initially. The trier of fact heard that. And then to go into the complete statement, I don't know that the Rule of Completeness requires that.

*Request for Self-Defense Instruction*

At the close of proof, defense counsel requested that the trial court provide the jury with a self-defense instruction. Defense counsel explained:

> I understand that there are two competing theories of the case here, and if the defense's theory is to be believed that at some point this encounter became nonconsensual and it was an assault on [Defendant], on his person, squeezing his testicles, and to the extent that he fought back to end that and get away, that is a self-defense claim.

The trial court denied the request for an instruction on self-defense, stating:

> I have reviewed the request for self-defense, and it appears to me that the instructions, as prepared now, cover all the theories of the case concerning alleged rape or the consensual part of that. I don't think -- I think it basically muddies the waters to put in that. I don't think it's really an issue, I think it's pretty clear the theory of the State this is what happened, the theory of the defense is this is what happened, so I think it's covered by the charge that's there.
>
> Now, if the defense wants to argue that he was fought off or something like that, I would have no objections to you doing that, but I don't think it's necessary in the charge itself.

Following deliberations, the jury found Defendant guilty of the lesser-included offense of aggravated sexual battery, and the trial court sentenced Defendant to serve eight years in the Tennessee Department of Correction. Defendant filed a timely motion for new trial, which the trial court denied in a written order. This timely appeal follows.

## II. Analysis

### A. Rule of Completeness

Defendant asserts that the trial court erred by denying his request to admit the entire video recording of his statement to police, pursuant to Tennessee Rule of Evidence 106, after the State questioned Defendant about what he said in portions of that interview. Defendant contends that the trial court's ruling allowed the State to "create an inaccurate impression of Defendant's statements" and that the entire video recording should have been admitted to "put Defendant's statements in proper context." Defendant argues that only by watching the entire video-recorded statement could the jury see "Defendant's

speech impediment, his youthfulness, his extreme emotion, the officers continuously coming and going from the interview room," and the officers' changing from one question and subject to another "without allowing complete answers to their questions, all of which played a role in the responses Defendant gave to any given question, thereby giving context to what was said during the interview as a whole." The State responds that the trial court properly exercised its discretion in denying Defendant's request to play the entire video recording when the State's questions about Defendant's prior inconsistent statements "were not so extensive as to require admission of his entire statement to provide context for the minor inconsistencies addressed in the State's questions."

Tennessee Rule of Evidence 106, sometimes referred to as the rule of completeness, provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Tenn. R. Evid. 106. Our supreme court has stated that Rule 106 is "intended to ensure that the jury can assess related information without being misled by considering only portions of an item of evidence." *State v. Quintis McCaleb*, --- S.W.3d ---, 2019 WL 3940922, at *6 (Tenn. Aug. 21, 2019) (citing *State v. Hartman*, 42 S.W.3d 44, 61 (Tenn. 2001)). Rule 106:

> reflects a concern for fairness and is designed to let the jury assess related information at the same time rather than piecemeal. This should help the jury avoid being misled by hearing only partial information about a writing or recorded statement. Moreover, it will assist the jury in assessing the weight to be given to the written or recorded statement by permitting the jury to consider at the same time other relevant writings and recordings.

Neil P. Cohen, et al., *Tennessee Law of Evidence* § 1.06[2][a] (6th ed. 2011) (footnotes omitted).

Regarding the impact of Rule 106 on the State's use of a defendant's statement, our supreme court has explained:

> In our view, Rule 106 reflects the concern for fairness found in cases such as *Espitia* [*v. State*, 288 S.W.2d 731, 733 (Tenn. 1956)]—that the trier of fact be permitted to assess related information without being misled by

hearing only certain portions of evidence. Accordingly, it appears that where the prosecution introduces a statement made by the defendant, the trial court may in the interest of fairness order that the remainder of the statement be admitted as well under Rule 106. Indeed, it would not be consistent with fundamental fairness to allow the prosecution to introduce only the most incriminating portions of a defendant's statement without regard to the overall context or relevant exculpatory portions found in the same statement. As *Espitia* indicates, the jury is to determine which statements to accredit.

*State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000) (citation omitted).

When Rule 106 is invoked, the controlling question is "whether the jury's accurate understanding of the evidence already admitted requires the admission of this additional evidence." *State v. Vaughn*, 144 S.W.3d 391, 407 (Tenn. Crim. App. 2003). Accordingly, evidence admitted under Rule 106 must: "(1) explain[] the already-admitted proof; (2) place[] the admitted proof in context; (3) avoid[] misleading the trier of fact; or (4) ensure[] a fair and impartial understanding of the already-admitted proof." *Id.*

The trial court is granted broad discretion to determine whether the rule of completeness should result in the admission of evidence, and this court therefore reviews the trial court's decisions in this matter under an abuse of discretion standard. *Keough*, 18 S.W.3d at 183; *see also Vaughn*, 144 S.W.3d at 407. The abuse of discretion standard of review is a less rigorous review of a trial court's ruling and envisions "a decreased likelihood that the decision will be reversed on appeal." *Quintis McCaleb*, 2019 WL 3940922, at *5 (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)) (internal quotation marks omitted). A trial court abuses its discretion when it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence and thereby causes an injustice to the complaining party. *Id.* Appellate courts must review a trial court's discretionary decision to determine: "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions." *Id.* (alterations in original).

We conclude that the trial court did not abuse its discretion in denying the request to admit the entire video recording of Defendant's statement to police. After taking an hour-long recess to review the issue, the trial court allowed the introduction of the first thirty-six minutes and twenty-five seconds of the video recording, explaining that the State cross-examined Defendant about prior inconsistent statements and that, in fairness,

- 12 -

the jury should see "in context why [Defendant] said what he said to the police." The trial court found that this portion of the video recording would allow the jury to see that Defendant subjected himself to police interrogation; that he gave a statement initially denying any contact with the victim; and that, after his mother left the room, Defendant acknowledged that he lied because his mother was there and he was embarrassed. The trial court found that this portion of the video recording would also allow the jury to see Defendant crying and his display of extreme emotion throughout the interview. After this portion of the video recording was played for the jury, the State cross-examined Defendant on four additional prior inconsistent statements that were contained in the next three pages of the transcript of the police interview. In response to the State's questions, Defendant was able to explain those inconsistencies.

The factual basis for the trial court's decision is supported by the evidence in the record. The first thirty-six minutes and twenty-five seconds of the video recording show the victim's emotion, his youthfulness, and his speech impediment; it also showed the officers' style of questioning and the interruptions by officers during the interview. During this portion of the video recording, Defendant explains that he initially lied to police because of his mother's presence in the room and because he was embarrassed. The trial court properly considered that, in the interest of fairness and to put Defendant's statement to police in context, this portion of the video recording should be admitted as evidence.

Defendant asserts that Rule 106 required that the trial court admit the remaining portion of the video recording.[2] We conclude, however, that the trial court's decision to show only the first thirty-six minutes and twenty-five seconds of the recording was "within the range of acceptable alternative dispositions." *Quintis McCaleb,* 2019 WL

_____

[2] We note some apparent confusion at trial regarding the exhibits that relate to this issue. Exhibit 138 is a disc that contains the entire video recording of Defendant's statement, which is one hour and twenty-nine minutes in duration. Exhibit 138 was admitted for ID purposes only. Exhibit 139, which was also admitted for ID purposes only, is a complete transcript of the video recording of Defendant's statement. The transcript is forty-six pages long. Exhibit 140 is a disc that contains a redacted portion of the video recording. It spans pages twenty-five through thirty-seven of the transcript and is thirty-six minutes and twenty-five seconds long.

Although Exhibit 140 was admitted into evidence, it is not the portion of the video recording presumably shown to the jury. The trial court ruled that only the first twenty-five pages of the transcript, which corresponded with the first thirty-six minutes and twenty-five seconds of the recording, would be shown to the jury. Exhibit 140—the redacted recording—was created by the State after Defendant testified and after the first portion of the video recording was shown to the jury. Thus, it appears that the jury viewed the first thirty-six minutes and twenty-five seconds of the video recording during Defendant's testimony and then had the opportunity to view the next thirty-six minutes and twenty-five seconds of the statement through Exhibit 140 and that only approximately seventeen minutes of the video recording was not submitted to the jury.

3940922, at *5. That portion of the video recording was sufficient to show that Defendant was answering questions in a highly emotional state while officers were coming in and out of the room and asking him a variety of questions. Moreover, the four additional questions asked by the State about Defendant's prior inconsistent statements were not so extensive as to require the admission of the entire video recording to put them into context. *See State v. Rodney E. Howard*, No. M2009-02081-CCA-R3-CD, 2010 WL 3774544, at *8 (Tenn. Crim. App. Sept. 29, 2010) (concluding that the State did not question the witness to an excessive degree about her preliminary hearing testimony such as to require the admission of the transcript of her preliminary hearing testimony into evidence pursuant to Rule 106), *perm. app. denied* (Tenn. Mar. 10, 2011); *State v. Christopher Shane Harrell*, No. E2005-01531-CCA-R3-CD, 2007 WL 595885, at *10 (Tenn. Crim. App. Feb. 26, 2007) (concluding that the trial court did not abuse its discretion when it declined to enter the defendant's entire pretrial statement into evidence), *perm. app. denied* (Tenn. June 25, 2007). The jury did not need to see the entire video recording of Defendant's statement to police in order to ensure a fair and impartial understanding of the proof. The trial court did not abuse its discretion, and Defendant is not entitled to relief.

*B. Self-Defense Instruction*

Defendant contends that the trial court erred by denying his request to instruct the jury on self-defense after it was fairly raised by the proof at trial. Defendant argues that, when he tried to disengage from the consensual sexual contact with the victim, the victim grabbed his testicles and would not let go, and Defendant became the victim of an assault. Defendant asserts that, when he hit the victim and pulled the victim down several cement stairs, he was defending himself and attempting to get away from the victim. The State responds that the trial court properly denied Defendant's request for a self-defense jury instruction because the facts of the case did not fairly raise the issue of self-defense. The State asserts that the struggle and the victim's resulting injuries were "outside the scope of the indictment and [could not] form the basis of a self-defense claim."

Whether the jury instructions were proper is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001). Under Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see also* Tenn. R. Crim. P. 30(d)(2). This obligation "extends to general defenses, such as self-defense, defense of another, or defense of a habitation." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (footnote omitted).

When evidence adequately supporting self-defense is admitted at trial, the question of whether an individual acted in self-defense is a factual question for the jury. *See State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). However, before a trial court may submit a defense question to a jury, the proof must fairly raise an issue as to the existence of that defense, and the defendant has the burden of introducing such proof. Tenn. Code Ann. § 39-11-203(c), Sentencing Comm'n Cmts. "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. In determining whether a general defense has been fairly raised by the proof, a trial court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. *Id.* If the evidence fairly raises the issue of self-defense, the trial court is required to submit the instruction to the jury. *Id.*

Tennessee's self-defense statute provides, in pertinent part:

[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

Tenn. Code Ann. § 39-11-611(b)(1) (2018).

Here, Defendant requested that the trial court instruct the jury on self-defense based upon his testimony that, when he became disinterested in the allegedly consensual sexual encounter with the victim, he attempted to stop the encounter but that the victim assaulted Defendant by squeezing Defendant's testicles. Defendant argued that, "to the extent that he fought back to end that and get away[,]" he was entitled to an instruction on self-defense. We conclude, however, that the proof did not fairly raise an issue as to the existence of that defense.

Defendant was charged with aggravated rape. As relevant here, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant . . . [where] the defendant causes bodily injury to the victim[.]" Tenn. Code Ann. § 39-13-502(a)(2) (2014). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2014). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2014).

Even when viewing the evidence in the light most favorable to Defendant, the evidence admitted at trial did not fairly raise the issue of self-defense as it related to the offense for which Defendant was on trial. Defendant argues that, when he became disinterested in the allegedly consensual encounter and attempted to leave, the victim grabbed Defendant's testicles. Defendant contends that he was then entitled to defend himself by hitting the victim and dragging the victim down the stairs. However, the events that formed the basis of the aggravated rape charge had already occurred prior to the victim's grabbing of Defendant's testicles. The victim testified that he was anally penetrated by Defendant's penis, that it was very painful, and that he repeatedly told Defendant "no." Defendant acknowledged that he penetrated the victim and that he did not use any lubricant before doing so. Ms. Ammons testified that the victim had a bruise larger than two centimeters on the anal tissue of his rectum and that this injury was consistent with forcible penetration. Thus, the elements of aggravated rape—sexual penetration and bodily injury—were established and the offense was completed before the victim grabbed Defendant's testicles, thereby necessitating Defendant's use of self-defense. In other words, Defendant's actions when the victim grabbed his testicles could not support a claim of self-defense *for the charged offense*.

By his own admission, Defendant was not acting in self-defense when he engaged in what he claimed was a consensual sexual encounter with the victim. The struggle that occurred and the injuries that the victim sustained after Defendant allegedly tried to end the sexual encounter would have been outside the scope of the indictment. Even if the jury were to accept Defendant's version of events, the scope of the indictment would only include the contact between Defendant and the victim during the supposedly consensual sexual encounter. The struggle that occurred after Defendant purportedly withdrew his consent cannot form the basis of a self-defense claim when the conduct was outside the scope of the indictment. Defendant was not charged with hitting the victim and dragging him down the stairs. Although Defendant was convicted of the lesser-included offense of aggravated sexual battery, lesser-included offenses only apply to conduct that is within the scope of the indictment. Lesser-included offenses cannot encompass behavior that would have been outside of the scope of the charged offense. *See State v. Burns*, 6 S.W.3d 453, 466 (Tenn. 1999) (stating that lesser-included offenses are "less serious versions" of the charged offense). Accordingly, we conclude that the trial court properly denied Defendant's request for a self-defense instruction.

### III. Conclusion

For the aforementioned reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 16 -